# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SHERIDA JOHNSON, SUBRINA SEENARAIN, CHAD LOURY, LINDA SPRY, LISA SULLIVAN, and APRIL AHRENS, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>NISSAN NORTH AMERICA, INC.,<br><br>      Defendant. | Case No. 3:17-cv-00517-WHO |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| TAMARA LOHR and RAVIKIRAN SINDOGI, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>  vs.<br><br>NISSAN NORTH AMERICA, INC., and NISSAN MOTOR CO., LTD.,<br><br>      Defendants. | Case No. 2:16-cv-01023-RSM |

## REPORT OF NEIL HANNEMANN

I, Neil Hannemann, declare as follows:

1. I submit this declaration in support of Plaintiffs' Motion for Class Certification.

2. Plaintiffs' counsel asked me to familiarize myself with certain aspects of this case so that I could help explain relevant information to the Court about the automotive industry and the vehicles at issue, including any technical aspects of the vehicles. I was also asked whether I had an opinion about whether the spontaneous shattering of the panoramic sunroof ("PSR") in Subject Vehicles is dangerous and whether it results from a defect.

3. Based on my education, training and experience, I can provide expert insight into a number of relevant issues. I have also formed the opinions below about the Nissan vehicles in this case and their PSRs. My opinions are stated to a reasonable degree of engineering certainty.

4. My opinions and analysis are based on my background, experience, education, and training in the field of Automotive Engineering, and on application of recognized laws of physics and principles of mechanical and automotive engineering to the specific issues that are the topics of this declaration, as well as the documents and information listed below.

5. Prior to stating my opinions, here is a brief outline of portions of my education, training and experience with vehicle design analysis that applies to the particular disciplines required to effectively render an opinion in this case.

6. I reserve the right to supplement this declaration as more information becomes available during this litigation.

## BACKGROUND, QUALIFICATION AND METHODOLOGY

7. I received a Bachelor's degree in Mechanical Engineering from General Motors Institute (GMI, now Kettering University) in 1981. At GMI, I was enrolled in the "Automotive

Option" curriculum. I was required to write a thesis as part of the degree program at GMI. My thesis was entitled "Design of an Emissions Laboratory." This followed specific course studies in internal combustion engines and engine emissions.

8. My curriculum vitae, which is Attachment A, shows my background in automotive design, design analysis and development engineering and my experience with body systems and glazing. I also have experience with the product creation process within large organizations, including Chrysler. My testimony list for the past 4 years is described in Attachment B.

9. While employed by a variety of automobile manufacturers I have been responsible for and participated at various levels in the design, analysis, testing and development of almost every vehicle system, including glazing for use in automobiles.

10. I have experience with vehicle recalls at various manufacturers, ranging from responsibility for decisions to perform a recall to root cause analysis of the issue being considered as a recall.

11. As the Chief Engineer of the Ford GT in 2002, I was responsible for determining which process would be best for the windshield and other glazing for the Ford GT. This lead into the supplier selection process. I was involved in a study of the "mid glass", a unique component that was between the driver, the mid-engine location and the rear window. Many different configurations were considered and I was responsible for approving the final selection for production. Considerations were given to NVH and safety as well as cost, weight, quality, durability and manufacturing feasibility among others.

12. While employed at Aptera in 2008, I had the design and release responsibility for the windshield and glazing. I performed a design analysis study for the use of Lexan polycarbonate

for the glazing other than the windshield. This included safety considerations for egress of the vehicle in an emergency.

13. As the Chief Engineer at Saleen, Inc., I was responsible for the windshield and glazing for the Saleen S7. This vehicle was extremely low volume and the manufacturing process for the glazing was also low volume, being made in small batches. This lead to specific quality procedures. I was also responsible for the roof design, development and testing of all Saleen products.

14. As the Program Manager of the Viper GTS/R Le Mans racing car I made the decision for making the lightest weight windshields possible. This lead to using different windshield designs for the pre-qualifying, qualifying and race events based on safety and durability.

15. As the Chief Engineer of the Ford GT beginning in 2002, I was responsible for a unique roof design. Not only was the material unique (aluminum rather than steel) the styling featured a relatively large part of the roof formed by the upper surface of the door. This required special attention to the design for safety, strength and function.

16. As a Suspension Design Supervisor at Chrysler Corporation during 1998, I was involved in all aspects of design for steering and suspension systems. I directed a group that was tasked to write an FMEA for suspension system design. I also participated on a team working on an FMEA for a run-flat tire while I was a Chrysler development engineer in 1992. While a Chief Engineer at Ford Motor Company in 2002, it was my responsibility to decide which components or systems merited an FMEA.

**MATERIALS REVIEWED**

17. I have reviewed the following information and materials:

      a. Documents produced by Nissan

      b. Published material

      c. Various legal documents

      d. Deposition testimony:

           i. Jonathan Zischke, August 22, 2019

           ii. Derek Latta, September 5, 2019

           iii. Shinichi Serino, September 12, 2019

           iv. David Schaller, February 3, 2021

18. I have billed my time at an hourly rate of $345.00 for all services in this case.

## THE PSRs IN THIS CASE

19. The following vehicles ("Subject Vehicles") are the subject matter of this case:

      a. 2009 to 2014 Nissan Maxima

      b. 2016 to 2020 Nissan Maxima

      c. 2014 to 2020 Nissan Rogue

      d. 2013 to 2020 Nissan Pathfinder

      e. 2009 to 2020 Nissan Murano

      f. 2013 Infiniti JX

      g. 2014 to 2020 Infiniti QX60

20. Each of the Subject Vehicles in this case was sold with a PSR.[1] Nissan appears to refer to this feature as both a "Dual panel panoramic moonroof" (Maxima)[2], "Power Panoramic

---

[1] Ex. T (NNA_0016503(Q2)), at 1-3 (Nissan Response to NHTSA Question 2); Ex. M (NNA_0016503(Q3)) (Response to NHTSA Question 3).

[2] Nissanusa.com, Nissan Maxima

5

Moonroof" (Murano, Rogue) and as "Sunroof Glass".[3] For purposes of this declaration these terms may be used interchangeably to refer to the same feature, which may also be referred to as a "panoramic sunroof" or a "PSR." PSRs are an upgrade option in vehicles sold by a variety of manufacturers. They are considerably larger than traditional sunroofs, usually ranging across the majority of the roof. In some cases they are a replacement for the entire roof panel. "Panoramic sunroof" as defined by the National Highway Traffic Safety Administration (NHTSA) specifies a size greater than 0.5 square meters.[4] Based on the information available to me at this time, the total glass area of these PSRs is greater than 0.5 square meters.[5]

21.     The PSRs in this case share a common design concept of tempered glass panels.[6] Each glass panel used in a Nissan vehicle panoramic sunroof has ceramic print on a portion of the glass.[7] Across all models of Subject Vehicles, every PSR uses ceramic print.[8] All Nissan vehicles using a panoramic sunroof use glass that is ▬▬▬▬▬▬▬.[9] All Nissan vehicles using a panoramic sunroof have a curvature to the glass.[10] The PSR assemblies in the Subject Vehicles

---

[3] Ex. E (NNA_0046340-0046352).

[4] NHTSA letter to the Premium Auto Group (INIP-EA06001-24122P), "Panoramic sunroof system: panoramic sunroof system is defined as a glass panel system with a combined surface area of greater than 0.5 square meters and having single or multiple fixed glass panels and/or single or multiple moveable glass panels that can tilt upward and slide back over the exiting roof structure.

[5] *See* Ex. M (NNA_0016503(Q3)).

[6] Ex. V (Excerpts from the Zischke deposition, August 22, 2019), p. 212.

[7] Ex. V (Excerpts from the Zischke deposition, August 22, 2019), p. 67.

[8] *Id.*

[9] Ex. V (Excerpts from the Zischke deposition, August 22, 2019), p. 62.

[10] Ex. V (Excerpts from the Zischke deposition, August 22, 2019), p. 61.

make up a large portion of the total roof area of each vehicle. The size of the glass contributes to the likelihood that it could be damaged by road debris. Further, the larger size allows more exposed area available for contact from road debris.[11] And, the larger the unsupported span, the higher the stresses from a given load can be.[12]



Figure 1 – Typical Nissan panoramic sunroof design[13]

---

[11] Ex. F (NNA_0054407-0054412), at 1 ("").

[12] Ex. D (NNA_0054343-0054344), at 1 (").

[13] Found at Bates NML-013319. A copy of the full document is not attached but can be submitted to the Court upon request.

22.     The Panoramic roof glass in this case are attached to the sunroof unit assembly frame through tracks and guides[14] on the moving glass and an opening and closing mechanism mounted to a sunroof unit assembly frame, and the sunroof unit assembly is then fastened to the vehicle roof (see Figure 1 above from Zischke deposition, Exhibit 5). In each vehicle, there is at least one moving panel.[15] That means that the moving panel needs to create pressure when closed to adequately seal and prevent water intrusion and wind noise as well as reduce exterior noise and operate in a typical vehicle environment. Each PSR is also curved.[16] Coupling curved parts, such as the glass panels to the sunroof frame in these vehicles, always produces an engineering challenge, especially when there are moving elements.

23.     The Subject Vehicles all have what is called a unibody construction. The loads from the road are transmitted into the unibody as opposed to a body on frame design in which the body is further isolated from the road loads through a separate vehicle frame, which the suspension is mounted to. This means that the roof is a stressed member of both the body and the frame of the vehicle.

## THE PSR FAILURES

24.     Automotive design principles require vehicles and their systems and components to be able to withstand the foreseeable challenges the vehicle will face in operation. Some automobile components are wear parts (e.g., tires and brakes), meaning they are designed to wear out over time and are expected to require replacement. Other components may be designed for the "design life" of the vehicle, (i.e., at least 10 years and 160,000 miles as one example that a vehicle

---

[14] Ex. V (Excerpts from the Zischke deposition, August 22, 2019), p. 46.

[15] Ex. T (NNA_0016503(Q2)) (Response to NHTSA Question 2).

[16] Ex. V (Excerpts from the Zischke deposition, August 22, 2019), p. 61.

manufacturer may use as the design life) but will be expected to require servicing or replacement after that time (components such as wheel bearings, alternators and many other components). Other components, including sunroof glass, are expected to last the life of the vehicle, regardless of mileage or time.[17]

25.     PSRs must withstand a number of foreseeable conditions and stresses. Subject Vehicles are subjected to a wide temperature spectrum. They also must withstand all forces created by vehicle movement, which includes a wide range of driving conditions, from potholes and speed bumps, cornering, and poor quality roads and freeways. They also must be able to withstand sudden thermal shocks, such as a car wash on a hot day to foreseeable impacts such as road debris. The expectation would be that PSR glass would not fail due to those types of conditions or stresses, absent a defect.

26.     Drivers report that the PSRs in the Subject Vehicles shatter without warning and outside the context of a collision or some other unexpected event that might be expected to cause the glass to fail. My review of the materials shows a consistent experience: without warning and for no apparent reason, a sunroof panel will shatter.[18] When the panel shatters, it makes a loud noise and pieces of glass may fall on the driver and passengers.[19] In many instances, the shattering

---

[17] Ex. H (WRSI-Lohr_000761-000765), at 3 ( ▮▮▮ ").

[18] Ex. E (NNA 0046340-0046352), at 10 (" ▮▮▮ ").

[19] *Id.*; Ex. K (NNA_0045273); Ex. E (NNA 0046340-0046352), at 12 (" ▮▮▮ ).

9

occurs when the vehicles are being driven, and in some instances, the vehicle is not moving.[20] Attached are photographs of the Plaintiffs' PSRs after their shatter events.[21]

27. I've worked in and around the automotive industry my entire career, spanning over 40 years and recall few if any instances of a tempered-glass component shattering except where there is a collision or a removable sunroof panel is dropped. These instances were only with smaller removable sunroofs and not with any PSRs. Since the panels of a Nissan PSR cannot be removed by an owner (without the use of tools) a Nissan PSR cannot be dropped.

28. Nissan understood that shattering sunroofs is a problem and discussed safer alternative designs. David Schaller, a Nissan employee, stated in an e-mail "Please find a sunroof glass from a BMW vehicle that exploded. It does not just happen to Nissan tempered sunroof glasses. I feel that laminate glass in sunroofs would be a better product for that application."[22]

## PSR SHATTERS ARE A SAFETY HAZARD

29. It is my opinion that the PSR shattering in the Nissan Subject Vehicles in this case is dangerous for drivers and passengers in the vehicles, and also for nearby pedestrians and other drivers.

30. Engineers must conduct engineering analysis to identify potential risks, hazards and dangers so that the risks, hazards and dangers can be designed away, guarded against or warned about.[23] A safety engineer's primary responsibility is to identify potential risks, hazards and

---

[20] Ex. G (NNA_0040409).

[21] Ex. W (Collection of photographs of Plaintiffs' Subject Vehicles).

[22] Ex. K (NNA_0045273).

[23] National Safety Council, Product Safety Management Guidelines, second edition. 1997, p. 36. *"The first concept is the safety engineering hierarchy of priorities:*

dangers associated with reasonably foreseeable uses and misuses of a product. Then, he or she should attempt to design out the dangers, guard against them or, as a last resort, warn about them.

31. There are many tools that can be used in order to ensure a vehicle, system or component is safe by design. These include: Preliminary Hazard Analysis, Failure Modes and Effects Analysis, Fault Tree Analysis, and Risk Assessments.[24] The use of these tools would have proven useful to Nissan during the decision process on the use and the design of a PSR.

32. Spontaneous or unexpected shattering of a sunroof is likely to startle and distract the drivers.[25] In a letter to Nissan, the National Highway Traffic Safety Administration (NHTSA) acknowledged that shattering glass could potentially distract drivers.[26] It is well known in the automotive industry that driver distraction is dangerous and causes many traffic accidents, injuries, and deaths each year.[27] Perhaps most notorious are accidents that result from drivers taking their eyes away from the road to look at cell phones. Accidents also result from attention being directed

---

> 1) *Eliminate Hazard*
> 2) *When hazards cannot be eliminated, provide feasible safeguards against them.*
> 3) *Provide warnings and personal protective equipment against remaining hazards.*"

[24] Main, B., W., McMurphy, K., J., "Safety Through Design: the state of the art in safety process", Society of Automotive Engineers, paper number 1999-01-042, p. 5.

[25] Ex. I (NML_009184-009194), at 9 ( ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ).

[26] Ex. BB, EA 14002, document INIM-EA14002-63590.pdf

[27] "Driver distraction and inattention: advances in research and countermeasures", Ashgate Publishing Company, Burlington, Vermont, 2013, p. 427.

"The chapters of this book demonstrate that distraction and inattention have been a persistent challenge for driving safety."

11

to radios, navigation systems, etc. Efforts have been made within the industry to lessen these distractions and to improve safety, for example by promoting the use of "hands free" devices and placing volume and other stereo controls on steering wheels where a driver's hand is already present during driving. A study by the NHTSA found that "Almost 80 percent of all crashes and 65 percent of all near-crashes involved the driver looking away from the forward roadway just prior to the onset of the conflict. Prior estimates related to "distraction" as a contributing factor have been in the range of 25 percent."[28]

33. Even a brief distraction can be dangerous, as it takes just a short time for a driver to lose control of the vehicle or for an unanticipated object, vehicle, or individual to enter its path. Similarly, drivers may unintentionally swerve, brake, or otherwise drive erratically after being startled.

34. When a PSR shatters the accompanying report is an explosive sound.[29] Some drivers describe the explosion as being extremely loud and compare it to a gunshot or a vehicle accident. Glass shards may fall within the cabin covering the vehicle occupants with glass when the roller blind is retracted.[30] The noise is distracting and the subsequent confusion caused by glass will provide further distraction. The Korean government in a safety investigation quoted the following driver reports:

- "The driver felt very surprised because he suddenly heard explosions like gunfight"

---

[28] Dingus, T. A., et. al., "The 100-car Naturalistic Driving Study, Phase II – Results of the 100-car Field Experiment.", Report No. DOT HS 810 593, April 2006.

[29] Ex. E (NNA 0046340-0046352), at 10 ("").

[30] Ex. E (NNA 0046340-0046352), at 12 ("").

12

- "The driver was not able to see for a moment because glass pieces fell into vehicle like rain. There was even the case of eye injuries of driver."

35. The spontaneous exploding of a PSR can also cause injury to the occupants of the vehicle. Below I list several firsthand reports from drivers in this case as found on the NHTSA website. These reports are all in addition to the many narratives from the NHTSA website that are shown in the Corrected Third Amended Complaint.

   a. *"WHILE DRIVING ON THE EXPRESSWAY ALL OF A SUDDEN GLASS IN MY SUNROOF JUST EXPLODED. MADE QUITE A NOISE AND STARTLED ME. THERE WERE NO TRUCKS IN FRONT OF ME AND NO OVER PASSES. THE GLASS BLEW OUT ALL OVER ME AND THE REST OF THE VEHICLE. WHEN CLEANING IT UP I COULD NOT FIND ANY EVIDENCE OF ANY THING THAT COULD HAVE HIT IT TO MAKE IT SHATTER. I FEEL AS THOUGH I WAS VERY LUCKY IN THIS CASE AS I DID NOT GET ANY GLASS IN MY EYES AND JUST A VERY SMALL CUT ON MY HAND. I WAS DRIVING ON THE EXPRESSWAY AT THE SPEED LIMIT WHICH IS 70 MPH AND CONSIDER MYSELF VERY LUCKY THAT I WAS NOT INVOLVED IN AN ACCIDENT AS A RESULT OF IT. I CALLED NISSAN AND THEY PRETTY MUCH JUST BLEW ME OFF, I THINK THAT IF THIS IS SOMETHING THAT IS HAPPENING THAT SOMETHING SHOULD BE DONE TO CORRECT IT IMMEDIATELY.* (NHTSA ID 11338604 – Date complaint filed: 7/7/2020)

   b. *WHILE DRIVING DOWN THE HIGHWAY, I HEARD A POP LIKE A SHOTGUN SOUND. I LOOKED AROUND AND THEN IN THE REAR VIEW MIRROR TO SEE SHARDS OF GLASS FLYING OFF MY CAR. I PULLED OFF THE ROAD TO INVESTIGATE AND SAW THAT THE FIRST PANEL OF THE SUNROOF EXPLODED FROM THE INSIDE OUT. I REMOVED THE GLASS I COULD TO PREVENT IT FROM BLOWING ONTO OTHER CARS AND THE HIGHWAY THEN CONTINUED TO MY HOME AND HAVE SINCE PARKED IN THE DRIVEWAY TO DETERMINE HOW TO REPAIR. *DSY* (NHTSA ID 11170342 – Date Complaint filed: 1/9/2019)

   c. *4 PASSENGERS IN OUR AWD ROUGE (2015), WITH A PANORAMIC SUNROOF, WERE DRIVING ON I-85 FROM LAS VEGAS, NV BACK TO SALT LAKE CITY, UT ON 12/08/2019, IN THE COUNTY OF BEAVER ABOUT 30 MILES FROM FILLMORE, UT, AT ABOUT 75 MPH (80 MPH INTERSTATE SPEED ZONE), WHEN ALL OF THE SUDDEN, WE HEAR A LOUD CRASHING SOUND. THERE WERE NO VEHICLES AROUND US ON THE ROAD, SO WE WERE ALL EXTREMELY TERRIFIED. THE CAR HAD BECOME VERY LOUD AT THAT POINT, AND WE IMMEDIATELY PULLED OVER TO SIDE OF THE ROAD. WE FOUND THAT THE PANORAMIC SUNROOF HAD COMBUSTED,*

13

> *LITERALLY SPONTANEOUSLY. IT WAS COMPLETELY WRECKED AND FOR NO REASON AT ALL. WE TOOK IT TO A SMALL SERVICE STATION AS SOON AS WE COULD, BUT WE WERE IN THE MIDDLE OF SMALL TOWNS WHEN THIS HAPPENED. ALL THEY WERE ABLE TO DO WAS ALLOW US TO VACUUM UP THE GLASS. A FEW OF US HAD CUTS ON OUR BODIES, SO WE BANDAGED THOSE UP WHILE THERE AS WELL. WE CALLED INSURANCE, THERE WERE NO OTHER CARS INVOLVED FORTUNATELY, AS THERE WERE NO OTHER VEHICLES CLOSELY AROUND US WHEN IT EXPLODED. THE INSURANCE COMPANY SAID WE WOULD HAVE TO PAY A $1,000 DEDUCTIBLE FOR THE INCIDENT TO BE REPAIRED. OBVIOUSLY, THIS WAS CONCERNING BECAUSE THIS WAS NOTHING OF OUR DOING. THIS WAS SIMPLY BECAUSE OF THE POOR DESIGN OF THE SUNROOF, AND HAS HAPPENED TO OTHERS AS WELL. NISSAN SHOULD PAY FOR THE DAMAGE, AND IN FACT, SHOULD RE-CALL ALL VEHICLES WITH SUNROOFS TO INSTALL A BETTER DESIGNED SUNROOF WITH APPROPRIATE GLASS. HAD WE HAD OUR SOFT TOP INSIDE OPEN, THERE IS NO TELLING WHAT WOULD OR COULD HAVE HAPPENED AS WE WERE DRIVING AT AN INTERSTATE SPEED. AFTER REVIEWING THE OTHER STORIES OF THIS HAPPENING, THIS NEEDS TO BE RECTIFIED IMMEDIATELY FOR THE SAFETY OF DRIVERS WITH SUNROOFS WITH THIS DESIGN BEFORE SOMETHING FATAL HAPPENS. I WILL BE JOINING THE CLASS-ACTION LAWSUIT ALREADY OPEN ON THIS EXACT SCENARIO THAT HAS HAPPENED TO SEVERAL OTHER PEOPLE.* (NHTSA ID 112888474 – Date complaint filed: 12/8/2019)

36. There are many complaints that express a concern for safety in addition to 2 of the 3 in the previous paragraph:

    a. I was driving on a highway and all of a sudden I hear a loud boom, as if a gun was fired right by my ear. I almost ran into another car because it startled me so. I pulled off onto a median and inspected the car. I looked at my car and when I looked at the roof, I realized that my sunroof was shattered. I was shocked! I was very fortunate to not have gotten into an accident. My son who was with me was also very scared. He was worried about the other windows exploding. It was very frightening. (NHTSA ID: 10716086 – Date Complaint Filed: 5/12/2015

    b. 2014 Nissan Maxima with 43000 miles. Sunroof exploded twice while driving on the freeway at 70 mph. Almost exact same of hole left in roof. Once on July 20th 2016 and once on August 15 2016 after being replace with OEM parts. Danger to my children in the car and others on the road. Nissan refused to do anything after calling in and speaking with the complaint department. I have since repaired it a second time and returned it to the dealership – I do not feel safe driving the vehicle. (NHTSA ID: 10914504 – Date Complaint Filed: 10/07/2016

    c. Sunroof of my 2011 Nissan Murano exploded suddenly while driving down the highway on a clear day and no other cars in the area. The malfunction of the sunroof exploding caused the sunroof glass to protrude outward into a done (sic) shape while glass pieces shattered into the cabin of the Murano. Upon contacting the Nissan dealer, they referred me to the national Nissan customer service number, but after 4 days I am still waiting on a call back from the regional Nissan office. This is a major safety issue that Nissan must take responsibility for correcting as soon as possible. (NHTSA ID: 10641082 – Date Complaint Filed: 10/03/2014

37. As discussed above, the NHTSA was concerned that PSR shattering events were dangerous. In October 2013, the NHTSA opened an investigation into PSR shattering in the 2011-2013 Kia Sorento. As part of its opening resume, the NHTSA noted that, "Glass shattering while driving could distract the driver and the resulting glass particles could injure occupants."[31]

38. Other manufacturers agree with the NHTSA. For example, Hyundai conducted a NHTSA-overseen safety recall in 2012 and 2013 because the PSRs could shatter while the vehicles were being driven.[32] The NHTSA's closing resume for the same recall states "Sunroof glass shattering while operating the vehicle poses a risk of personal injury or a vehicle crash."[33] As part of that recall, Hyundai also advised drivers that:

> Hyundai has decided that a defect, which relates to motor vehicle safety, exists in certain model year 2012 Hyundai Veloster vehicles equipped with a panoramic sunroof that were produced during the period beginning on November 1, 2011 through April 17, 2012
>
> . . . .
>
> An investigation by Hyundai has determined that the panoramic sunroof glass in certain Hyundai Veloster vehicles may have been damaged during an automated assembly procedure at its factory. This damage may result in subsequent fracture of the panoramic sunroof glass.
>
> The above condition may cause driver distraction if the panoramic sunroof glass

---

[31] Opening Resume PE 13-035

[32] Closing Resume, PE 12-027

[33] Closing Resume, PE 12-027

panel were to break while the vehicle is in motion. Additionally, broken safety glass inside the vehicle may pose a risk of minor cutting injury to vehicle occupants.[34]

39.     Volkswagen conducted a similar safety recall in the fall of 2014. In a recall report to the NHTSA, Volkswagen wrote:

> Due to a production process issue at the sunroof glass supplier, some vehicles may have been built with a panoramic sunroof glass panel with a steel frame that may have been manufactured out of tolerance. As this manufacturing issue could cause additional stress to the glass panel, the glass panel may be susceptible to breakage if the vehicle experiences a sudden jolt, such as when hitting a large bump or pothole in the road – especially in cold temperatures. Usage of certain de-icing salts also has been identified as a contributing factor. If the glass panel were to break when the vehicle is in motion, it could cause driver distraction, increasing the risk of a crash.[35]

In the recall notice to drivers, Volkswagen wrote that it "has decided that a defect, which relates to motor vehicle safety" exists and that "If the glass panel were to break when the vehicle is in motion, it could cause driver distraction, increasing the risk of a crash."  Volkswagen also recommended that the owner keep the sunshade fully closed until this recall repair has been completed.  "This will help minimize the chance of broken glass falling into the passenger compartment, should the sunroof panel break."

40.     Based on my experience with automotive design principles, shattered glass in a non-collision event is a dangerous phenomenon that can and should be avoided. As Mr. Read describes in his report, when tempered safety glass shatters it creates hundreds or thousands of small, mostly cube-shaped fragments. Many of the fragments retain sharp edges that constitute cutting hazards. In addition, the sound created at the instant the panel shatters is quite loud, with

---

[34] Hyundai Owner Notification Letter (Safety Recalls 12V-568 and 13V-051)

[35] Volkswagen Owner Notification Letter (Safety Recall 60B9), https://static.nhtsa.gov/odi/rcl/2014/RCONL-14V658-3621.pdf?_ga=1.251049089.627498399.1492378133

16

many owners describing it as sounding like an explosion or gunshot. This constitutes an audible hazard that could lead to driver distraction and has the potential to cause a collision. As Mr. Read describes, there are reasonable design changes that could significantly reduce or eliminate these dangers.

41. In my opinion, Nissan's failure to adopt or institute reasonable measures to reduce or eliminate the hazards presented by the defective PSRs is unreasonable under the circumstances. Nissan's continued use of tempered glass panels in its PSRs constitutes a dangerous defect and creates a real hazard for a Subject Vehicle's occupants, regardless of how frequently the defect actually manifests in form of a shattering event.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on February 17, 2021 in Camas, Washington.

*/s/ Neil Hannemann*
_____
Neil Hannemann