Gregory F. Coleman (*pro hac vice*)
Mark E. Silvey (*pro hac vice*)
Adam A. Edwards (*pro hac vice*)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
First Horizon Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
Facsimile: (865) 522-0049
gcoleman@milberg.com
msilvey@milberg.com
aedwards@milberg.com

[Additional Counsel on Signature Page]

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| SHERIDA JOHNSON, SUBRINA SEENARAIN, CHAD LOURY, LINDA SPRY, LISA SULLIVAN, and APRIL AHRENS on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>   v.<br><br>NISSAN NORTH AMERICA, INC.,<br><br>                    Defendant. | Case No.: 3:17-cv-00517-WHO<br><br>**PLAINTIFFS' OPPOSITION TO NISSAN'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE:          June 29, 2022<br>TIME:          2:00 p.m.<br>LOCATION:   Courtroom 2, 17th Floor<br>JUDGE:      Hon. William H. Orrick |

## Table of Contents

I.   INTRODUCTION ................................................................................................ 1

II.  MATERIAL FACTS ........................................................................................... 2

III. LEGAL STANDARD ........................................................................................ 5

IV. ARGUMENT ..................................................................................................... 6

    A.   Plaintiffs' Consumer Protection Claims Are Not Appropriate for Resolution on Summary Judgment. ................................................................................................. 6

        1.  Plaintiffs Have Adequately Defined the Defect, which is Supported by Substantial Evidence. ............................................................................................... 7

        2.  Nissan's Compliance with NHTSA is Irrelevant and Unavailing. ...................... 12

    B.   The Law and Evidence Establish that Nissan's Omission was Material. ..................... 12

    C.   Plaintiffs Reasonably Relied on Defendant's Omission and are Entitled to a Presumption of Reliance. ............................................................................................... 17

    D.   Plaintiff's CLRA and UCL Claims Are Properly Venued and Do Not Require a Direct Transaction. ............................................................................................... 21

    E.   Plaintiff's Implied Warranty Claims are Supported by the Record. ............................. 23

    F.   Plaintiffs' Unjust Enrichment Claims Survive Defendant's Challenges. ..................... 24

V.  CONCLUSION ................................................................................................. 25

# Table of Authorities

**Cases**                                                                                                              **Page(s)**

856 N.E.2d 542 (Ill. App. Ct. 1st Dist. 2006) ................................................................ 17

2020 WL 7356715 at *4 (N.D.N.Y. Dec. 15, 2020) ....................................................... 17

*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) ...................................... 5, 25

*Anderson v. Ford Motor Co., Case No. 17-03244-CV-S-BP*, 2020 WL 1853321 (W.D. Mo. Feb. 14, 2020) ................................................................................................................ 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................. 5, 6

*Ashgari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1036 (C.D. Cal. 2013) ..................... 22

*Aubin v. Union Carbide Corp.*, 177 So. 3d 489–95 (Fla. 2015) .................................... 7

*Beaty v. Ford Motor Co.*, 854 F. App'x 845 (9th Cir. 2021) ................................ 11, 13 5, 16, 17

*Beaty v. Ford Motor Co., Case No. C17-5201 TSZ*, 2021 WL 3109661 (W.D. Wash. July 22, 2021) ............................................................................................................... 17

*Brown v. Super. Ct.*, 44 Cal. 3d 1049 (1988) .......................................................... 7, 8

*Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247–56, 864 N.E.2d 249–56 (2007) ..................... 7

*Carriuolo v. Gen. Motors Co.*, 823 F.3d 977 (11th Cir. 2016) ....................................... 6

*Cavanaugh v. Stryker Corp.*, 308 So. 3d 149 (Fla. Dist. Ct. App. 2020) ......................... 7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................... 5, 9

*Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138–45 (N.D. Cal. 2005) ..................... 6, 22

*Chinatown Neighborhood Assoc. v. Harris*, 33 F. Supp. 3d 1085 (N.D. Cal. 2014) ............ 23

*Colgate v. JUUL Labs, Inc.*, 345 F. Supp. 3d 1178 (N.D. Cal. 2018) ............................. 8

*Connick v. Suzuki Motor Co.*, 675 N.E.2d 584 (1996) ............................................... 6

*Daniel v. Ford Motor Co.*, 806 F.3d 1217 (9th Cir. 2015) ..................................... 13, 18

*Edwards v. Ford Motor Co.*, 603 F. App'x 538 (9th Cir. 2015) .................................. 13

*Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884 (N.D. Cal. 2015) ............................ 12

*Ehrlich v BMW of N. Am., LLC*, 801 F. Supp. 2d 908 (C.D. Cal. 2010) ....................... 14

*Fasolas v. Bobcat of New York, Inc.*, 33 N.Y.3d 421–30, 128 N.E.3d 627–33 (2019) ............... 7

*In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig., Case No. 14-CV-5696*, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) .......................................................... 16

*Intell. Cap. Partner v. Institutional Credit Partners LLC, No. 08 CIV. 10580* (DC), 2009 WL 1974392 (S.D.N.Y. July 8, 2009) ...................................................................... 24

*Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19 (2007) ................................ 23

*IV Solutions, Inc. v. Connecticut Gen. Life Ins. Co., No. CV 13-9026-GW*, 2015 WL 12843822 (C.D. Cal. Jan. 29, 2015) ................................................................................ 18

*Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168 (N.D. Cal. 2017) ...................... 7

*Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994) ..................................................... 18

*Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342 (2012) ........................................ 6

*L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852–67 (N.D. Cal. 2015) .............. 21

*Lassen v. Nissan N. Am.*, 211 F. Supp. 3d 1267 (C.D. Cal. 2016) ................................ 10

*LLC v. State Farm Fire & Cas. Co., Case No. 20-CV-07074-WHO*, 2021 WL 7160671 (N.D. Cal. Oct. 5, 2021) ...................................................................................... 23

*Maldonado v. Apple, Inc., Case No. 3:16-cv-04067-WHO*, 2021 WL 1947512 (N.D. Cal. May 14, 2021) ........................................................................................................ 18

*Mazella v. Coca-Cola Co.*, 548 F. Supp. 3d 349 (S.D.N.Y. 2021) ................................ 6

*Mazella*, 548 F. Supp. 3d ................................................................................. 6

*McAdams v. Monier, Inc.*, 182 Cal. App. 4th 174 (2010) .......................................... 22

*In re MyFord Touch Consumer Litig.*, 46 F.Supp.3d 936 (N.D. Cal. 2014) ...................... 14

*No. 06-cv-7023*, 2007 WL 2461660 at *2-3 (N.D. Ill. Aug. 27, 2007) ......................... 17

*O'Connor v. BMW of N. Am., LLC, Case No. 18-CV-03190-CMA-STV*, 2020 WL 1303285 (D. Colo. Mar. 19, 2020) ............................................................................... 23, 24

*Phillips v. Apple Inc., No. 15-CV-04879-LHK*, 2016 WL 1579693 (N.D. Cal. Apr. 19, 2016)   19-20, 20, 21

*Pooshs v. Philip Morris USA, Inc.*, 904 F. Supp. 2d 1009 (N.D. Cal. 2012) ................... 18

*PSRs. Enea v. Mercedes-Benz USA, LLC, Case No. 18-CV-02792-HSG*, 2019 WL 402315 (N.D. Cal. Jan. 31, 2019) ............................................................................... 24

*Rhino Linings USA, Inc. v. Rocky Mtn. Rhino Lining, Inc.*, 62 P.3d 142, 149-150 (Colo. 2003) ... 17

*Sciacca v. Apple, Inc.*, 362 F. Supp. 3d ........................................................... 10

*Sierra v. Stonebridge Life Ins. Co.*, 2013 WL 5323083 (D. Colo. Sept. 23, 2013) ............. 17

*Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840 (N.D. Cal. 2018) ............................ 19

*Soule v. Gen'l Motors Corp.*, 8 Cal. 4th 548 (1994) ............................................... 9

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prod. Liab. Litig.*, 890 F. Supp. 2d 1210 (C.D. Cal. 2011) ...................................................................... 14

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) .......................................... 21

*Warner v. Ford Motor Co., No. CIVA06CV02443-JLKMEH*, 2008 WL 4452338 (D. Colo. Sept. 30, 2008) .................................................................................................. 6

*Wasco Prods., Inc. v. Southwall Technologies, Inc.*, 435 F.3d 989 (2006) ..................... 18

**Statutes**

Cal. Bus. & Prof. Code § 17200 .................................................................... 6

Cal. Civ. Code § 1770 ............................................................................. 6, 7

Cal. Civ. Code § 1780 ................................................................................ 22

Col. Rev. Stat. § 6-1-101 ............................................................................. 6

Fla. Stat. § 501.204(1 ................................................................................. 6

General Business Law § 349 .......................................................................... 6

General Business Law § 350 ................................................................................. 6

N.Y. GBL §§ 349-50 ........................................................................................ 7

**Rules**

Fed. R. Civ. P. 8 ............................................................................................... 18

Fed. R. Civ. P. 9 ........................................................................................ 10, 18

**Other**

49 C.F.R. § 571.5 ............................................................................................ 12

49 C.F.R. § 571.205.S2 ................................................................................... 12

1

## I.      **Introduction**

2          Defendant Nissan North America, Inc. filed its motion for summary judgment on April 29,

3   2022 (ECF No. 212) ("Motion" or "MSJ"). However, as it has done throughout this litigation,

4   Nissan's Motion misconstrues Plaintiffs' claims in an attempt to distract the Court from the

5   fundamental truth that there are disputes of material fact which must be resolved by a jury,

6   rendering summary judgment improper.

7          Specifically, while the parties agree on some of the underlying facts—for example, that

8   Nissan offered panoramic sunroofs ("PSRs") as a premium upgrade on several of its car models[1]

9   without ever disclosing that those PSRs were liable to shatter spontaneously, often loudly, resulting

10   in a shower of glass shards—there are certain questions that must be answered by a jury: for

11   instance, does Nissan's decision to use a material with this propensity in its PSRs constitute a

12   defect? Would a reasonable consumer expect that the glass selected by Nissan for use in its PSRs

13   has this propensity when subjected to regular use? Would a reasonable consumer consider Nissan's

14   withholding of this information material? These, and other questions explored below, have not

15   been foreclosed by Nissan's Motion, and cannot be decided by this Court as a matter of law.

16          Nissan crows that "glass breaks." *See* MSJ at 12 (claiming that "all of [Plaintiffs]

17   arguments come down to this"); *see also* MSJ at 3, 14, and 19. But just as obvious is that vehicles,

18   throughout their regular and intended usage, will encounter pebbles, hail, and other debris, while

19   also being subjected to regular vibrations, temperature fluctuations, and other foreseeable

20   stressors. It is therefore incumbent on manufacturers to select materials which can suffer this

21   exposure without introducing new and unnecessary safety risks. Here, despite knowing that small

22   impacts and repetitive stress is a fact of the road, acknowledging internally that PSRs present

23   ─────────────────

24   [1]    Plaintiffs have requested certification of:

25          all California, Colorado, Florida, Illinois, and New York state residents who
          purchased or leased in the states of California, Colorado, Florida, Illinois, and New
26          York a model year 2014-2020 Rogue, 2009-2014 and 2016-2020 Maxima, 2013-
          2020 Pathfinder, 2009-2020 Murano, 2013 Infiniti JX, or 2014-2020 Infiniti QX60
27          with a factory-installed panoramic sunroof

28   *See* ECF No. 135 (Plaintiff's Motion for Class Certification), at 10 (hereinafter, "Class Vehicles").

concerns when designed with tempered glass, and even after learning that consumers were being

harmed by its decision, Nissan nevertheless continued—and still continues—to use over-sized

panels of insufficiently thin, fritted, and curved tempered glass for its PSRs (the "Defect").

## II.   **Material Facts**

Historically, automobile sunroofs have been modestly sized, spanning just a small portion

of the roof. But starting as early as 2004, automobile manufacturers expanded the size of the

sunroofs to encompass nearly the entire roof of the vehicle. *See* Declaration of Mitchell M. Breit

in Support of Plaintiff's Opposition to Nissan's Motion for Summary Judgment ("Breit

Declaration" or "MMB Decl."), Exhibit ("Exh.")[2] 1; *see also* Exh. 2 (Zischke Dep.) at 17:4-25.[3]

Nissan advertises its PSRs as increasing the sunlight and "roominess" in the vehicle. Exh. 41; *see

also* Nicole Taylor, *Which Nissan Vehicle has a Sunroof or Moonroof?* VILLAGE NISSAN (Sept.

30, 2020), https://www.villagenissan.com/nissan-sunroof-moonroof/ (last visited May 26, 2022)

(attached to the Breit Declaration as Exh. 3). But the expansion of the area covered by the sunroof,

requiring significantly larger sheets of glass, poses new and significant engineering challenges that

Nissan failed to meet. *See* Exh. 9 ("[I]ncreases in cases [of exploding sunroofs]… is [likely] size

related … vehicle[s] like [the] Maxima and Murano [] have substantially more glass area on the

roof [and] a larger glass area will statistically result in more potential for stone impact"). Indeed,

the average size of the Class Vehicles' ████████████████████████████████

██████████████ Exhs. 1 (Supplier Information for All Models); 4 (NHTSA Gen'l Order to

Manufacturers); 5 (Read Report) at ¶17; *see also* Exh. 6 (NHTSA letter concerning PSR).

The glass used in Nissan's PSRs is manufactured ████████████████, the same two

manufacturers responsible for the glass used in the PSRs of other car manufacturers subject to

similar consumer complaints about their PSRs. Exh. 7 (Latta Dep.) at 260:23-261:6. ████████

████████████████████████████ the specifications these manufacturers used in the

PSRs' tempered glass does not vary. Exh. 8; *see also* Exh. 9. Several car manufacturers who used

---

[2]     All subsequent "Exhibit" or "Exh." citations are to the Breit Declaration exhibits, unless
otherwise indicated.

[3]     The Class Vehicles are all installed with PSRs. Exh. 15 (Schaller Dep.) at 23:10-13.

tempered glass manufactured by ████████████ in their PSRs, recalled the models after consumer reports that the PSRs were explosively shattering. *See* Exhs. 10 (NHTSA Closing Resume); 11 (Hyundai Recall); 12 (Volkswagen Recall). Nissan has chosen to ignore the problem.

In addition to their manufacturers, the PSRs in the Class Vehicles share several key characteristics which, combined, make them inadequate for their purpose. Specifically, all of the subject PSRs are constructed with ██████ glass (Exhs. 1; 13 (Verghese Dep.) at 15:18-16:10; 14 (Read Dep.) at 53:14-16, 55:19-25), which is curved to fit the Class Vehicles' profile (Exhs. 13 (Verghese Dep.) at 172:7-173:6; 14 (Read Dep.) at 286:1-17; 302:10-25), painted with frit (i.e., ceramic paint) around the edge (Exhs. 15 (Schaller Dep.) at 35:20-36:22; 14 (Read Dep.) at 71:3-74:17; 114:24-115:11; 116:16-117:3) then is fully tempered (Exhs. 13 (Verghese Dep.) at 32:17-33:24; 14 (Read Dep.) at 40:25-41:12; 15 (Schaller Dep.) at 23:10-13; 32:24-33:9; 36:18-22). The result is glass with a temper imbalance, which causes internal tension (Exhs. 16; 17), that is then compressed into a metal frame. *See* Exh. 5 (Read Report) Figure #5, ¶¶ 22-25, 52, 55-56. While this configuration initially appears to benefit from increased resilience—that is, tempered glass can withstand greater impacts than non-tempered glass without immediately shattering (*id.* at ¶25)—the truth is otherwise: the tension introduced while curving, tempering, and fritting the glass means that the Class Vehicles' PSRs are prone to spontaneous shattering events. Exh. 19 ("Even with all the testing and specification in the world, as long as we are tempered [sic] glass we will have to deal with an explosive breakage event …, in other words heat strengthened glass will always shatter."). In short, any impact or abrasion endured by a PSR during its normal operation— or even while parked—can cause a minor chip or scratch, which, through regular flexions (e.g., temperature fluctuations, road vibrations, closing doors) will propagate through the exterior surfaces to the core, at which point it explodes. Exhs. 15 (Schaller Dep.) at 71:12-24 ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

Nissan has known about this defect since at least 2008, ████████████████████

████████████████████████████████████████████████████████

████████████████████ Exh. 21 (███████████████████████████████████).

1    Since then, Nissan has been continuously notified, through numerous channels, that exploding

2    PSRs are a serious concern to consumers, pose a safety risk, and is an ongoing problem that can

3    occur at any time without warning. Exhs. 8 (Powerpoint for ████████████████ ); 9; 16

4    (Internal ████████████████ ); 22 (Email discussing the Korea Automobile Testing &

5    Research Institute into PSRs). There has been a flood of consumer complaints about Nissan's

6    PSRs, both to Nissan and publicly, since at least 2008 (Exh. 21; *see also* Exhs. 23 (NNA's internal

7    consumer complaints); 24 (Collecting NHTSA Complaints)) and including in published articles.

8    *See* Jeff Plungis and Thomas Germain, *Exploding Sunroofs: Danger Overhead*, CONSUMER

9    REPORTS (Oct. 12, 2017) available at: https://www.consumerreports.org/car-safety/exploding-

10   sunroofs-danger-overhead/ (last visited May 26, 2022) (attached to the Breit Declaration as Exh.

11   25). The reports consistently describe sudden, "spontaneous," "explosions" of the PSRs without

12   any apparent cause, as well as consumers' fear for their safety. *See* Exh. 24.

13        The National Highway Traffic Safety Administration ("NHTSA") even opened an

14   investigation regarding "spontaneous sunroof shattering, resulting in potential driver distraction

15   (while in motion) and injuries from falling glass fragments"; although NHTSA's investigation was

16   primarily concerned with Kia-manufactured vehicles, it underscores the public concern regarding

17   exploding PSRs. Exh. 26 (NHTSA Letter); *accord* Exh. 27 (NHTSA's Opening Resume); *see also*

18   Exh. 15 (Schaller Dep.) at 53:16-22, 54:4-8, 56:11-17 (Nissan's Field Quality Engineer confirming

19   that such explosions would be distracting).

20        Nor are the defective PSRs used because they are the only alternative.  Laminated glass—

21   two or more pieces of glass ████████████████████████████████████

22   ██████████████████████ so would not fall into the vehicle when broken. *See*

23   Exhs. 8 at NNA_0046340 (█████████████████████████████████████████

24   ██████████████████ ); 28 (ANSI Z26.1 1996 Standard). Further, because laminated

25   glass is not under tension, a failure is not "explosive." Exhs. 19; 29. Laminated and tempered glass

26   can be combined to provide both cohesion and impact-resistance (*see* Exh. 5 (Read Report) at

27   ¶ 62), or tempered glass can be affixed with a film to "hold[] individual glass fragments together

28   as an intact panel" when the PSRs shatters. Exh. 30 (████████████████ ); *see also* Exhs.

1   31 (Government Industry Meeting re Roof Ejection Mitigation Research); 32 (8mm film produced

2   by 3M could be applied to the sunroof glass to protect it from surface damage; *accord* Exh. 5 (Read

3   Report) at ¶ 64-67.

4          Nissan's continued refusal to correct the Defect, or to even notify consumers of the risk

5   that their PSRs may explode unexpectedly, is inexplicable.  Nissan already employs several

6   channels to communicate with its customers (both existing and prospective), including advertising,

7   user manuals, warranty booklets, and notices affixed to the vehicle.  *See, e.g.,* Exh. 33 (Nissan's

8   *Safety Recall & Service Info* online lookup tool). Further, as Nissan is regularly engaged in various

9   recalls (*see, e.g.*, Exh. 34 (Kelly Blue Book website collecting Nissan's recalls)), it is

10  unquestionably equipped to identify owners of its vehicles, send hard-copy or electronic mail, and

11  otherwise notify them of safety concerns.  And yet, Nissan continues to ignore the concerns with

12  its PSRs, withholding the information from its consumers while continuing to sell vehicles tainted

13  with the Defect. *See, e.g.,* Exh. 35 (Ahrens Dep.) at 89:21-25; Exh. 36 (Johnson Dep.) at 34:21-

14  35:5, 87:11-13; Exh. 37 (Loury Dep.) at 54:4-5; Exh. 38 (Seenarain Dep.) at 23:5-9, 38:4-12; Exh.

15  39 (Spry Dep.) at 89:3-8; Exh. 40 (Sullivan Dep.) at 101:13-15, 196:15.

16  **III.    Legal Standard**

17         A party is entitled to summary judgment only if it "shows that there is no genuine dispute

18  as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. ("FRCP")

19  56(a). A dispute is genuine if it could reasonably be resolved in favor of the nonmoving party, and

20  material where it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

21  242, 248 (1986). The moving party bears the burden of showing an absence of any genuine issue

22  of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Only if it succeeds,

23  the burden shifts to the non-moving party to identify evidence showing that a material factual issue

24  remains for trial. *Id.* The court draws all inferences from the admissible evidence in the light most

25  favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.

26  2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

27  inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The

28  non-moving party need not show that the issue will be conclusively resolved in its favor, but rather

1   need only identify sufficient evidence to create a genuine dispute of material fact, thereby

2   "requir[ing] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id*. at 248-

3   49 (internal quotation marks omitted).

**IV.    Argument**

   **A.    Plaintiffs' Consumer Protection Claims Are Not Appropriate for Resolution on Summary Judgment.**

6      Plaintiffs bring consumer-protection claims under the laws of their respective states.[4] To

7   prove these claims, Plaintiffs will present evidence that (1) Nissan engaged in an act or practice

8   prohibited by state statute; (2) the act or practice was materially misleading; (3) Plaintiffs suffered

9   injuries; and (4) Nissan's materially misleading conduct caused Plaintiffs' injuries.[5] All of these

10  elements will be established through common evidence, particularly as the last three elements—

11  materiality, injury and causation—are judged according to an objective consumer.[6]

---

[4]    *See* Plaintiffs' Fifth Amended Complaint, ECF No. 208 ("Complaint" or "5AC"). Count III, ¶ 200 (Cal. Bus. & Prof. Code § 17200, California's Unfair Competition Law (UCL)); Count IV, ¶ 211 (Cal. Civ. Code § 1770(a), California's Consumer Legal Remedies Act (CLRA)); Count V, ¶ 220 (New York's General Business Law § 349); Count VIII, ¶ 282 (New York's General Business Law § 350); Count IX, ¶ 282 (Col. Rev. Stat. § 6-1-101, Colorado Consumer Protection Act (CCPA)); Count XI, ¶ 318 (Fla. Stat. § 501.204(1), Florida's Deceptive and Unfair Trade Practices Act (FDUTPA)); Count XII, ¶ 334 (815 ILS 505/2, Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA)) (hereinafter collectively, the "Consumer Protection Claims"). The statutes underlying the Consumer Protection Claims employ similar legal requirements in prohibiting unfair, unlawful, deceptive, and misleading business practices in the conduct of trade or commerce.

[5]    The requirements under each states consumer protection statutes are substantively similar. *See Klein v. Chevron U.S.A., Inc.,* 202 Cal. App. 4th 1342, 1382-83 (2012); *accord Chamberlan v. Ford Motor Co.,* 369 F. Supp. 2d 1138, 1144–45 (N.D. Cal. 2005); *see also Warner v. Ford Motor Co.,* No. CIVA06CV02443-JLKMEH, 2008 WL 4452338, at *10 (D. Colo. Sept. 30, 2008) (laying out the standard for CCPA); *Carriuolo v. Gen. Motors Co.,* 823 F.3d 977, 983 (11th Cir. 2016) (Identifying "[t]he elements comprising a consumer claim for damages under FDUTPA); *Connick v. Suzuki Motor Co.,* 675 N.E.2d 584, 593 (1996) (Identifying "[t]he elements of a claim under the ICFA); *Mazella v. Coca-Cola Co.,* 548 F. Supp. 3d 349, 355 (S.D.N.Y. 2021) (identifying standards under N.Y. GBL §§ 349-50 are substantively identical).

[6]    *Chamberlan*, 369 F. Supp. 2d at 1145 ("Materiality is judged by the effect on a "reasonable consumer," and this standard applies to CLRA claims"); *Connick*, 675 N.E.2d at 595 (same for Illinois); *Warner,* 2008 WL 4452338 at *10 (adopting standard outlined in *Connick*); *Carriuolo,* 823 F.3d at 983 (same for Florida); *Mazella,* 548 F. Supp. 3d at 356 (same for New York).

Fundamental to Plaintiffs' Consumer Protection Claims—whether for demonstrating that "Nissan represents that its vehicles and panoramic sunroofs are of a particular standard, quality, or grade when they are not" (ECF No. 208, 5AC ¶ 210(c); *see also* Cal. Civ. Code § 1770(a)(7)), that Nissan "disseminated through New York … omissions that were untrue or misleading" (5AC ¶ 264; *see also* N.Y. GBL §§ 349-50), or for another purpose—is demonstrating that Nissan designed and sold a defective product. "[A] product is defectively designed if it failed to perform as safely as an ordinary consumer would expect when used as intended or reasonably foreseeable," or alternatively, "if, on balance, the risk of danger inherent in the challenged designed outweighs the benefits of the design." *Brown v. Super. Ct.*, 44 Cal. 3d 1049, 1057 (1988) (citing *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 430); *see also Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1177 (N.D. Cal. 2017).[7]

### 1. Plaintiffs Have Adequately Defined the Defect, which is Supported by Substantial Evidence.

Throughout its Motion, Nissan complains that Plaintiffs have "no proof of a defect, or even a definition." MSJ at 1, 14; *see also e.g.*, 11 ("What does not appear … is any definition of … 'defect'"). Yet the Defect is set forth in Plaintiffs' Complaint (*see* 5AC ¶¶ 23-42 (section titled "The Nissan Panoramic Sunroof Defect")) and has remained consistent throughout this case (*see* ECF No. 1 ¶¶ 19-38 (same)). In truth, Nissan does not want to admit that its own design decision *is* the Defect: it selected for its PSRs a type of glass (fully tempered, ███████, curved and fritted) which has a propensity to shatter—loudly and often with an accompanying rain of glass shards— when subjected to the foreseeable impacts and stresses sustained in regular, everyday use.

A design defect may be established under either the (i) consumer expectation test or (ii) the risk-benefit test. *Brown*, 44 Cal. 3d at 1057 (citations omitted). "[A] plaintiff has met his burden

---

[7] The standards for determining a design defect are meaningfully the same across the jurisdictions, considering the consumer-expectation test and risk-benefit test (or risk-utility, in Illinois) as alternative or overlapping standards. *See Fasolas v. Bobcat of New York, Inc.*, 33 N.Y.3d 421, 429–30, 128 N.E.3d 627, 632–33 (2019); *Calles v. Scripto-Tokai Corp.,* 224 Ill. 2d 247, 254–56, 864 N.E.2d 249, 254–56 (2007); *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 494–95 (Fla. 2015); *Cavanaugh v. Stryker Corp.*, 308 So. 3d 149, 155 (Fla. Dist. Ct. App. 2020), review denied, No. SC21-219, 2021 WL 3485938 (Fla. Aug. 9, 2021); *Walker v. Ford Motor Co*., 2015 COA 124, ¶¶ 10-14, 410 P.3d 609, 612–13, *aff'd on other grounds*, 406 P.3d 845, ¶¶ 10-14.

1   if he establishes that there was a defect in the manufacture or design of the product and that such

2   defect was a proximate cause of the injury." *Colgate v. JUUL Labs, Inc.*, 345 F. Supp. 3d 1178,

3   1193 (N.D. Cal. 2018) (citation omitted). Here, Plaintiffs have adduced more than enough

4   evidence to satisfy these requirements at trial.

5          For instance, there is abundant evidence that the Defect caused the Class Vehicles to "fail

6   [] to perform as safely as an ordinary consumer would expect when used as intended." *Brown*, 44

7   Cal. 3d at 1057. There are, of course, Plaintiffs' descriptions of the incidents (Exhs. 35 (Ahrens)

8   at 127:5-133:21; 36 (Johnson) at 184:8-192:6; 37 (Loury) at 130:25-134:14; 38 (Seenarain) at

9   203:11-252:22; 39 (Spry) at 167:24-173:20; 40 (Sullivan) at 111:19-122:1), which parallel the

10  experiences reported publicly.[8] In addition, Plaintiffs have collected numerous consumer

11  complaints (made both to Defendant directly and declared publicly), demonstrating that

12  spontaneously exploding sunroofs cause concern amongst drivers and are not something they

13  expect to occur. Exhs. 23; 24. Further, NHTSA's investigation "of spontaneous sunroof shattering,

14  resulting in potential driver distraction (while in motion) and injuries from falling glass fragments"

15  demonstrates that exploding PSRs was of sufficient public concern to attract regulatory attention.

16  Exhs. 27; 26. Even this Court has acknowledged that "Nissan could not have intended for the

17  panoramic sunroofs to explode." ECF No. 55 at 10. Likewise, a reasonable consumer could not

18  have expected the PSR to explode; Plaintiffs certainly did not. *See* Exhs. 35 (Ahrens) at 188:12-

19  190:3, 191:12-23, 278:10-14, 280:17-25; 36 (Johnson) at 63:16-64:5, 84:23-85:9, 167:22-168:3;

20  37 (Loury) at 238:1-13; 38 (Seenarain) at 334:10 335:2; 39 (Spry) at 97:25-98:7; 40 (Sullivan) at

21  139:3-8, 167:1-18, 170:4-19, 196:15-197:6.

22

23

24

---

25  [8]     Heather Savage had two of her five children with her in their 2016 Nissan
        Pathfinder... They were on their regular route home [] going about 40 mph, when
26      Savage heard a loud, powerful explosion… Then she looked up and saw that the
        sunroof had exploded… "When I was looking at cars, I loved the sunroof, but I
27      never imagined in a million years that would happen."

28  Exh. 25.

If, instead, the risk-benefit test were applied,[9] the evidence demonstrates that, on one hand, Defendant's use of too-thin, curved and fritted tempered glass, poses a risk of spontaneous, loud eruptions of glass above a driver's head, including while travelling at highway speeds. *See, e.g.*, Exhs. 10 (NHTSA acknowledging "[s]unroof glass shattering while operating the vehicle poses a risk of personal injury or a vehicle crash."); 26; 27; *accord* NHTSA ID 11170342 (complaint of an explosion of a PSR exploding while driving at about 75 MPH on I-85 causing consumer distraction), Exh. 24; *see also* Exh. 12 (Volkswagen recall of vehicle with similar PSR because "[i]f the glass panel were to break when the vehicle is in motion, it could cause driver distraction, increasing the risk of a crash."). Against this indisputable hazard, the only "benefit" to consider is the luxury of allowing slightly more sunlight in the cabin of the car while driving during the day and improved "roominess." Exh. 41; *see also* Exh. 3. Nissan claims that there is also a "benefit" insofar as "tempered safety glass [is] stronger than other types of glass, and … if it breaks, it will break into small, light pieces with dulled edges [] by design." MSJ at 1; *see also id.* at 3, 12. To the contrary, amongst the numerous alternatives to Defendant's design are options which hold the broken pieces together if it breaks (i.e., annealed laminated glass)—which Nissan's own Field Quality Engineer believed more appropriate for the PSRs (Exh. 42)—and even those which combine the strength of tempered glass with the non-exploding nature of laminate (Exh. 29 (NNA_0054343)).[10] At the very least, this contradicting evidence demonstrates the necessity of a jury to weigh the credibility and persuasiveness of each party's position.

[9]     To be clear, Plaintiffs believe the consumer expectations test is appropriately applied in this case—because "the everyday experience of [a car owner] permits a conclusion that the [PSRs] design violated minimum safety assumptions"—and Nissan has not contended otherwise. *Soule v. Gen'l Motors Corp.*, 8 Cal. 4th 548, 567 (1994).

[10]     Defendant also claims, without ***any*** evidence, that its selection of too-thin tempered glass is "lighter than other types of glass, lowering a vehicle's center of gravity [] and improving fuel economy." MSJ at 1, *see also id.* at 3. Nissan cannot foreclose Plaintiffs' claims on its mere conjecture, particularly when contrary evidence in the record—including statements by the manufacturer of Defendant's PSRs—considers alternative designs which would add almost no weight while "holding individual glass fragments together as an intact panel" when the PSRs shatters. Read Report ¶ 64-67, *see also* Exhs. 30, 31, 32, and Exh. 19 at WRSI-Lohr000762. (

*(fn. cont'd.)*

9

1        Nissan suggests that "the design defect standards developed in the products liability context

2   do not readily map to the consumer fraud context," and asserts that Plaintiffs have pointed only to

3   "the effects of the alleged defect" rather than identify it specifically. MSJ at 11 (quoting *Lassen v.*

4   *Nissan* N. Am., 211 F. Supp. 3d 1267, 1287 (C.D. Cal. 2016)); *id.* at 12 (quoting *Sciacca v. Apple,*

5   *Inc*., 362 F. Supp. 3d 787, 797 (N.D. Cal. 2019)). But the nonbinding authority Nissan relies on

6   for both claims instead demonstrate that Plaintiffs' definition of the Defect here, and their

7   supporting evidence, ***are*** sufficient. In *Lassen*, the plaintiffs alleged that their vehicles were

8   defective because the keyless fob ignition system lacked an auto-off feature which left the vehicle

9   running even while unattended, potentially subjecting purchasers to the risk of carbon monoxide

10   poisoning. 211 F.Supp.3d at 1271. Not only had none of the proposed class representatives

11   suffered carbon monoxide poisoning, but also, rather than identify a specific way in which the

12   keyless fobs were defective, the plaintiffs only asserted that the keyless fobs could be "use[d] in a

13   dangerous way, and they lack a safety feature [] that could mitigate that danger." *Id.* at 1281-83.

14   Similarly, in *Sciacca*, purchasers claimed that "the screens of [Apple] watches were detaching,

15   cracking, or shattering," "but [were] notably silent on identifying the defect that causes such

16   consequences" and "[did] does not allege that the cracking, shattering, or detaching is a

17   consequence of 'any systematic design, technical, manufacturing, or other flaw present.'" 362 F.

18   Supp. 3d at 797-98 (citation omitted) (applying the heightened Rule 9(b) pleading standard on a

19   motion to dismiss). Here, in contrast, Plaintiffs are clear that the Class Vehicles were defectively

20   designed because Nissan's PSRs are too thin for their purpose, further weakened by being curved

21   and fritted, and subject to additive crack propagation when used as intended. Of course (as Nissan

22   is eager to point out), there is always a risk that glass will fail, but "the key is selecting the

23   appropriate design features and glass type to minimize the risk associated with the chosen

24   application." Exh. 5 (Read Report. at ¶ 23, *see also* Exh. 14 (Read Dep.) at 41:2-12.

25

26   _____

    ███████████████████████████████████████████████████████

27   Ultimately, Nissan's suggestion that tempered glass is used for PSRs because of its weight does
   not demonstrate to the court that Plaintiffs cannot establish an essential element of their case.
28   *Celotex,* 477 U.S. at 322-23 (1986).

Nissan also challenges Plaintiffs' ability to demonstrate the existence of a common defect because of insignificant differences between various Class Vehicle models. MSJ at 9. But Plaintiffs can offer common proof both of the existence of the Defect, as well as of its effects. As Plaintiffs have maintained throughout this litigation, the Class Vehicles are all equipped with PSRs manufactured by ██████████ which are substantially similar in design in all material respects. Exh. 5 (Read Report) at ¶17; Exh. 43 (Hannemann Report) at ¶ 21; Exh. 9 (NNA_0054407); *see e.g.*, Exh. 5 (Read Report) Figures # 5-7. Each PSR is comprised of large, ████████, glass panels that are curved, fritted (i.e. edged with ceramic paint), and fully tempered, before being attached to the Class Vehicles' unibody frame using tracks on an opening and closing mechanism. *See, e.g.,* Exh. 5 (Read Report) at ¶¶ 17, 26-27, 29, 31; Exh. 43 (Hannemann Report) at ¶ 21-23; ECF No. 135, Exh. 2 (Zischke Dep.) at 61:11-25; 62:1-7, 64-70; 72:25 – 73:1-19; 212). These are the design features that are common to all Class Vehicles and that have led to the Defect, and it is appropriate to consider them together. *See* Exh. 44 (Hannemann Dep.) at 148:10-149:8; *see also Beaty v. Ford Motor Co.,* 854 F. App'x 845, 848 (9th Cir. 2021) ("Because the purpose of the 'substantial similarity' inquiry is to determine relevance in the context of a defective product, the relevant similarities are properly defined in terms of the defect at issue.").

Despite these common features, Nissan asserts that the glass panels in the PSR "differ in size and shape, and in particular [the] locations of their PSR glass panels on the vehicle's roof," suggesting without support or explanation that these distinctions are relevant. MSJ at 4 (quoting Verghese Rept. at 41). But again, by highlighting the fundamental points of disagreement between the parties, and between their experts, Nissan has simply demonstrated why summary judgment is so inappropriate. *Beaty*, 854 F. App'x at 848-49 ("[V]iewing the evidence in the light most favorable to the [Plaintiffs], as we must, a reasonable juror could find that [Defendant] knew that the PSR defect would persist in the substantially similar PSRs installed in the [product at issue]."). Under circumstances nearly identical to those here, *Beaty* found that the competing expert reports—i.e., Plaintiffs' opining that Nissan's PSRs are built "the same way by the same two manufacturers, and thus share five 'common defective design features,'" while Nissan's claimed there are "significant differences" in the models—created a triable issue of fact: "If [Defendant's

11

expert] said one thing and [Plaintiffs' expert] said another on the same subject, it is the role of the jury, not a court on summary judgment, to determine the facts." *Id.* at 849 (quoting *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1067 (9th Cir. 2016)).

### 2.  Nissan's Compliance with NHTSA is Irrelevant and Unavailing.

Nissan repeatedly insists that "the whole point of tempered safety glass, and the reason NHTSA permits it to be used in sunroofs, is that if it does fracture it will break into small pieces," seeming to suggest that "government-approved tempered safety glass" cannot be implicated in a design defect. MSJ at 17, 12; *see also id.* at 1 (same), 3 (describing NHTSA's standard for vehicle glass). This suggestion is disingenuous at best; the regulation at issue—Federal Motor Vehicle Safety Standard ("FMVSS") 205—was approved nearly ten years before the introduction of PSRs to the market, and so could not have any bearing on the propriety of tempered glass in over-sized glass-covered holes in the roof of a vehicle. *See* 49 C.F.R. § 571.5(c)(4). Moreover, while neither FMVSS 205 nor ANSI/SAE Z26.1–1996 dictates what glass may be used in any type of sunroof (describing instead the type of strength tests that tempered or laminated glass must survive), it ***does*** specify that tempered glass may ***not*** be used for the other large piece of curved glass which regularly suffers impacts from road debris: the front windshield. *See* 49 C.F.R. § 571.205.S2. Exh. 28, (ANSI Z26.1 1996 Standard). Thus, if anything, the NHTSA standard suggests that the most appropriate material for large, curved transparent materials in consumer vehicles—like front windshields ***and*** PSRs—is laminated glass. But, again, it is the jury's role to balance the weight of this evidence at trial.

### B.  The Law and Evidence Establish that Nissan's Omission was Material.

Plaintiffs agree that "[u]nder each of the consumer protection statutes at issue here, [they] must prove Nissan's alleged omission was material," which is gauged by its impact on "a reasonable consumer." MSJ at 13-14 (collecting cases). Because materiality focuses on the defendant's conduct, and "is judged by an objective reasonable person standard," it "can be determined relative to the class as a whole." *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 920 (N.D. Cal. 2015). The same inquiry is made for every class member, and a failure "to disclose

1   information that would have been material to a reasonable person . . . gives rise to a rebuttable

2   inference of reliance as to the class." *Edwards v. Ford Motor Co.*, 603 F. App'x 538, 541 (9th Cir.

3   2015). Defects that are alleged to create unreasonable safety risks are considered material. *Daniel*

4   *v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015).

5         Although the Ninth Circuit, in a nearly identical case, has recently and unequivocally held

6   that "a reasonable juror could find that the risk of a spontaneously shattering PSR ***is material to***

7   ***consumers***," Nissan nevertheless contends that "Plaintiffs cannot prove materiality." *Beaty*, 854

8   F. App'x at 849 (emphasis supplied); MSJ at 14. In *Beaty*, as here, the defendant-automobile

9   manufacturer "started manufacturing cars with [PSRs] and soon after began receiving complaints

10   from customers who alleged that their PSRs exploded without warning." 854 F. App'x at 847. One

11   of those customers—like Plaintiffs here—suffered this explosion, and subsequently asserted class

12   claims under Washington's Consumer Protection Act. *Id*. *Beaty* overturned a summary judgment

13   ruling for the auto-manufacturer, finding that "there is a triable issue of fact as to whether the PSR

14   shattering issue would be material to a reasonable consumer." *Id.* at 849.

15         But Nissan maintains that its omission was not material (*see* MSJ at 13-17) arguing, in

16   short, that the danger imposed by the defect is not serious enough ("No reasonable consumer would

17   change his or her behavior if told glass may break," *id.* at 14), not frequent enough ("the risk of

18   fracture is miniscule," *id.*), and not dangerous enough ("cannot identify a single case where a

19   fractured PSR caused anyone to seek medical attention," *id.* at 17). Nissan, thankfully, does not

20   decide what is "dangerous enough" or "risky enough"—that is the jury's role—but further, the

21   Ninth Circuit rejected these same arguments in *Beaty*.

22         As explained above (section IV.A.1., *supra*), Defendant's first argument is premised on its

23   claimed misunderstanding of the Defect. But the Defect is not that "glass breaks," as Nissan

24   contends, and thus the omission is not simply that "glass may break if it is struck by an object"

25   (MSJ at 14); instead (as Nissan knows) the Defect "is that the PSRs incorporated into all Class

26   Vehicles are designed [such] that the glass spontaneously and explosively shatters when subjected

27   to ordinary and foreseeable driving conditions." ECF No. 158, at 3-4 (filed Aug. 2, 2021)

28   (emphasis omitted). As demonstrated by the multitude of consumer complaints (both Defendants'

13

1   customers and those of other manufacturers with similar Defects), the named Plaintiffs' testimony

2   in this case (*see* Exhs. 35 (Ahrens) at 278:10-14; 36 (Johnson) at 86:23-25, 167:22-168:3;

3   37 (Loury) at 238:1-13; 38 (Seenarain) at 334:10-335:2; 39 (Spry) at 97:25-98:7; 40 (Sullivan) at

4   139:3-8, 167:1-18, 170:4-19), NHTSA's investigations into exploding PSR incidents (Exhs. 18;

5   26; 27) and even Nissan's own employees' concerns about the use of tempered glass (Exh. 19

6   ("[I]t does not make me feel better that the glass over my head uses the bare minimum")), the fact

7   that a PSR might spontaneously shatter without explanation "is one 'to which a reasonable person

8   [] attach[es] importance in determining" what vehicle to buy. *Beaty*, 854 Fed. App'x. at 849

9   (citation omitted); *see also e.g., In re MyFord Touch Consumer Litig.*, 46 F.Supp. 3d 936, 960

10  (N.D. Cal. 2014) ("[A] reasonable jury could find a safety concern here with respect to MFT that

11  gives rise to a duty to disclose."); *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices*

12  *& Prod. Liab. Litig.*, 890 F. Supp. 2d 1210, 1219 (C.D. Cal. 2011) (finding omission material to

13  ordinary consumer in deciding to purchase a car since the undisclosed defect posed a safety risk);

14  *Ehrlich v BMW of N. Am., LLC, 801 F. Supp. 2d 908, 918* (C.D. Cal. 2010) (finding defective

15  windshields—high propensity to chip or crack—created an unreasonable safety risk that would be

16  material to a reasonable consumer).

17         Defendant's second argument—that PSRs do not explode often enough—is similarly

18  unavailing, both in *Beaty* and here. "[Defendant] makes much of its calculated failure rate [11] but

19

---

20  11      Notably, the alleged failure rate in the vehicles at issue in *Beaty* (0.05%) was *half* of what
    *Nissan's* expert has estimated for mere claims relating to Nissan's exploding PSRs. *Compare* 854
21  Fed. App'x at 849 *with* Padmanaban Report at 3, 6 (estimating claims rate of 0.1% for "1,178,584
    units sold," or approximately 117,858 incidents). In both *Beaty* and this case, of course, "[t]he
22  [plaintiffs] contest this [] rate as underinclusive." 854 Fed. App'x at fn. 4; *see also* ECF No. 158
    at 4-5, ECF No. 173 at 11. Specifically, Nissan's expert admits to only relying on reported warranty
23  claims data for those claims Nissan chose to pay, even though, as Nissan has clarified through this
    litigation, "glass breaking" is not a warrantable event. Exh. 7, (Latta Dep.) at 108:20-109:7; 117:3-
24  118:4. 47:4-14.

25         To the extent Nissan contends that Plaintiffs' "own experiences" are relevant to
26  determining the relevant "rate at which Nissan's PSRs shatter," its cited facts only demonstrate
    that the Defect can manifest at any time, without any apparent cause or explanation, just as
27  Plaintiffs' allege. MSJ at 15-16 (demonstrating that Defect might manifest at 20,000 or 80,000
    miles). But more importantly, Defendant's citations to the record only presents additional
28                                                                                    *(fn. cont'd)*

1  a reasonable juror could find that even a small risk that a PSR might explode without warning is a

2  material fact, given that ***the practical question is whether to purchase a luxury accessory at a***

3  ***premium***." *Id*. at 849-50 (emphasis supplied).

4      The Ninth Circuit's reasoning in *Beaty* also exposes the flaw in the non-binding Missouri

5  district court decision on which Nissan primarily relies. *See* MSJ at 15 (quoting *Anderson v. Ford*

6  *Motor Co*., Case No. 17-03244-CV-S-BP, 2020 WL 1853321 (W.D. Mo. Feb. 14, 2020)). The

7  court in *Anderson* failed to appreciate that the materiality of a purchasing decision has to be gauged

8  against the context of the purchase. 2020 WL 1853321, at *3 (comparing PSRs to car brakes).

9  Because brakes are a fundamental and intrinsic part of every vehicle purchase, the materiality of

10  buying a car with brakes must be weighed against purchasing a car *at all*. In contrast, whether to

11  buy a vehicle with a PSR, as opposed to one without, is merely a decision about purchasing a

12  luxury upgrade; as such, the risk that such an "upgrade" may in fact violently explode, without

13  warning or apparent cause is, relatively, a much more significant consideration.[12]

14      Finally, Defendants do not think enough danger is imposed by a piece of glass exploding

15  above one's head, even when it happens while travelling at freeway speeds. But *Beaty* considered

16  and discarded this argument as well: "Though [defendant] contends that no serious injuries have

17  occurred yet, it is reasonable to assume that a consumer will attach importance to traumatic

18  occurrences that result in 'only' near-misses and relatively minor abrasions." 854 F. App'x at 850

19  (finding plaintiff's testimony that "driving around with something that could randomly occur

20  again" is "stressful" and prevents her from "us[ing] the car as intended," "sufficient evidence to

21  preclude summary judgment on materiality."). Indeed, because consumer protection statutes are

22  intended "to protect members of the public from injury in their property or business by reason of

23  unfair or deceptive acts and practices in trade or commerce[, they] would hardly be served if

24  ────────────────

25  considerations to be weighed by the jury when judging Nissan's culpability; it has not foreclosed
   any of Plaintiff's claims.

26  [12]    Further, *Anderson* applied Missouri's defect standard which—like the improper NHTSA
27  standard that *Beaty* rejected—considers whether "the product, as designed, is unreasonably
   dangerous." 2020 WL 1853321, at *4. This is not the standard for a defect in any of the relevant
28  jurisdictions. *See supra* footnote 7.

PLAINTIFFS' OPPOSITION TO NISSAN'S MOTION FOR SUMMARY JUDGMENT
3:17-cv-00517-WHO

1    deception were not actionable unless the consumers' very lives were at stake." *Id.* at 849. "Nor is

2    there any obvious inconsistency between a defectively designed product and a low claims rate: a

3    defective design could make the possibility of catastrophic failure significantly more likely without

4    either triggering an actual failure or the filing of a claim." *In re Fluidmaster, Inc., Water Connector*

5    *Components Prod. Liab. Litig.*, Case No. 14-CV-5696, 2017 WL 1196990, at *21 (N.D. Ill. Mar.

6    31, 2017). Finally, the unfortunate reality is that if an exploding PSR has been responsible for a

7    serious injury, or even death, it is unlikely that the connection would ever be made; in a serious

8    accident, no one is going to think twice about a shattered sunroof.

9         Recognizing, as it must, that *Beaty* is recent, relevant, and binding authority which soundly

10   forecloses all of Nissan's arguments against materiality, Nissan is reduced to claiming simply that

11   *Beaty* is "not precedential." MSJ at 16. Nissan first takes issue with the fact that *Beaty* "was based

12   on Washington law" (*id.*), but it notably does not suggest that Washington's laws regarding

13   materiality are different than those at issue here; it does not identify a difference, because there is

14   not one. *Compare Beaty*, 854 F. App'x at 849 ("A material fact is one 'to which a reasonable

15   person would attach importance in determining his or her choice of action in the transaction in

16   question.'") (citation omitted) *with* MSJ at 14 (considering materiality of an omission to be based

17   on whether a "reasonable consumer would change his or her behavior if told"; citing *Connick v.*

18   *Suzuki Motor Co.*, 174 Ill. 2d 482, 505 (1996) ("A material fact exists where a buyer would have

19   acted differently knowing the information, or if it concerned the type of information upon which

20   a buyer would be expected to rely in making a decision whether to purchase.")). Second, Defendant

21   asserts that *Beaty* was based solely on correcting the district court's improper adoption of the

22   NHTSA standard for materiality. MSJ at 16. But, as *Beaty* explains, "even if the district court did

23   not apply an erroneous standard of materiality, there is a triable issue of fact as to whether the PSR

24   shattering issue would be material to a reasonable consumer … [because] PSRs fail[ing]

25   prematurely and in unexpected ways [] is contrary to consumer expectations." 854 F. App'x at

26   849–50. Defendant even goes so far as to suggest that, under *Beaty*, evidence of a fracture rate is

27   mandatory to "prove this is a material fact." MSJ at 16. But despite Defendant's implication, the

28   Ninth Circuit did not even mention whether the plaintiffs had submitted their own evidence of the

16

failure rate (simply that they challenged Defendant's evidence as underinclusive), and certainly did not rely on such evidence in finding that a jury could reasonably find the PSRs material. *Beaty*, 854 Fed. App'x at 849-50, fn 4. Indeed, the "PSR replacement rates, based on data produced by Ford" which Nissan presumably refers to, was not introduced into the record until *after* the Ninth Circuit had issued its ruling and the case had returned to the district court. *Beaty v. Ford Motor Co.*, Case No. C17-5201 TSZ, 2021 WL 3109661, at *4 (W.D. Wash. *July 22, 2021*); *see also Beaty*, 854 F. App'x 845 (decided *April 2, 2021*).

Accordingly, and contrary to Nissan's arguments, there is sufficient evidence from which the jury can determine that a reasonable consumer would find the fact of the Defect a material consideration when deciding whether to purchase a vehicle with such a "luxury upgrade."[13]

## C. **Plaintiffs Reasonably Relied on Defendant's Omission and are Entitled to a Presumption of Reliance.**

To prove reliance on an omission, a plaintiff must show that

> the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct. A plaintiff need not prove that the omission was the only cause or even the predominant cause, only that it was a substantial factor in his decision. A plaintiff may do so by simply proving that, had the omitted information been disclosed, one would have been aware of it and behaved differently.

_____

[13] Defendant claims that without an established "failure rate" Plaintiffs are not able to prove that the defect is material. But its cited cases do not support this claim. *See* MSJ at 16. In *Munch v. Sears Roebuck & Co.*, for instance, the plaintiffs' *only* evidence of a defect was a "high failure rate"; the court found that this evidence, by itself, was not enough to demonstrate a defect and would only be material if introduced alongside other evidence of a defect. No. 06-cv-7023, 2007 WL 2461660 at *2-3 (N.D. Ill. Aug. 27, 2007). Similarly in *White v. DaimlerChrysler Corp.*, the court required that the defendant have knowledge of the failure for a failure rate to even be relevant. 856 N.E.2d 542, 549 (Ill. App. Ct. 1st Dist. 2006). The court in *Kommer v. Ford Motor Co.*, admits that a showing that the products at issue fail at a low rate "could have some bearing on whether the alleged omission was material" but does not go as far as to say that establishing a failure rate is an essential element to establish materiality. 2020 WL 7356715 at *4 (N.D.N.Y. Dec. 15, 2020). Defendant's own authority lays out that there are other modes of making a showing that that the challenged practice affects the public interest. The court in *Rhino Linings USA, Inc. v. Rocky Mtn. Rhino Lining, Inc*., allowed plaintiff in a sale of land contract dispute to proceed with its claim because it made a showing that there was a significantly impact the public, because the sellers misrepresentations to the buyer caused harm to a third party who had no contractual relationship with seller. 62 P.3d 142, 149-50 (Colo. 2003). Defendants also cite *Sierra v. Stonebridge Life Ins. Co.,* 2013 WL 5323083, at *5 (D. Colo. Sept. 23, 2013) (which is not applicable as it is a contract dispute over a single payers life insurance policy, so the plaintiff could not prove impact to the public based on fraudulent misrepresentation of the terms of the life insurance policy).

ECF. No. 207 at 2 (citing *Daniel v. Ford Motor Co.*, 806 F.3d 1217 (internal quotation marks and citations omitted)). Further, "while, typically, averments of fraud must be accompanied by 'the who what when where, and how' of the misconduct charged, pure omissions claims can succeed without the same level of specificity required by a normal fraud claim." ECF No. 192 at 13 (quoting *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1018 (N.D. Cal. 2020) (internal quotation marks, edits, and citations omitted)). On this basis, the Court has previously held that Plaintiffs allegations satisfy the requirements of Rule 9(b):

> The "who" is Nissan. The "what" is the alleged truth about the propensity of sunroofs to explode. The "when" is before the sale of class vehicles. The "where" is Nissan's communications channels about the vehicles, including disclaimers or at point of sale. The "how" is via omitting that plausibly material information"

*Id.* Defendant nevertheless seeks to relitigate these issues.

Defendant claims first that this Court's earlier rulings were not only wrong ("Nissan [] disagrees that this was sufficient [for pleading]"), but also no longer apply because "Plaintiffs have *abandoned* [the] 'defect' theory" on which they were based. MSJ at 18 (emphasis in original). But Plaintiffs have not changed (or "abandoned") their theory of the Defect and have at all times maintained that Defendant's decision to use an incorrect material (thin, curved, fritted, and tempered glass) which was not suitable to withstand the purpose for which it was employed (i.e., minor impacts or abrasions, propagated by normal thermodynamic fluctuations and other flexions). ECF No. 1 ¶¶ 30-38; ECF No. 158 at 6-7; ECF No. 135 at 9; Read Report ¶¶ 2, 25, 27-28, 39, 51-56. Instead, "[a]t virtually every link in its chain of reasoning, [Defendant] either misapplies the law, misunderstands the plaintiffs' theory of liability, or both." *Maldonado v. Apple, Inc.*, Case No. 3:16-cv-04067-WHO, 2021 WL 1947512, at *12 (N.D. Cal. May 14, 2021). "[T]he reality is that Nissan has been aware of these allegations for years […], so it strains credulity to think that Nissan is not sufficiently aware of the basis of this four-year-claim." ECF No. 192 at 14.[14]

---

[14]    Nissan suggest that Plaintiffs have changed their defect theory and are therefore pleading new allegations for the first time in summary judgment. MSJ at 19 (citing to *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994); *IV Solutions, Inc. v. Connecticut Gen. Life Ins. Co.*, No. CV 13-9026-GW, 2015 WL 12843822 (C.D. Cal. Jan. 29, 2015); *Wasco Prods., Inc. v. Southwall Technologies, Inc.*, 435 F.3d 989 (2006); and *Pooshs v. Philip Morris USA, Inc.*, 904 F. Supp. 2d 1009 (N.D.
*(fn. cont'd)*

18

1  Nissan next claims that Plaintiffs cannot demonstrate what warning it should have

2  provided, or how such a warning would have been disseminated. MSJ at 19-20.[15] But as this court

3  has explained, the proper inquiry is "what channels of information customers depend upon and

4  whether the defendant could have taken action to disseminate information through those channels."

5  ECF No. 207 at 2 (citing *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 875 (N.D. Cal. 2018);

6  *see also Phillips v. Apple Inc*., No. 15-CV-04879-LHK, 2016 WL 1579693, at *5 (N.D. Cal. Apr.

7  19, 2016) (noting that plaintiffs do not need to demonstrate that defendant's omission were "the

8  sole or even the predominant or decisive factor influencing his conduct.") (quoting *In re Tobacco

9  II Cases*, 46 Cal.4th 298, 314, 327 (2009)). In addition to Nissan's standard methods of

10  communication with consumers—both directly (through, e.g., warnings on the vehicles purchased,

11  statements in user manuals and warranty booklets), and indirectly (through, e.g.,

12  advertisements)—it is also unquestionably equipped to communicate safety concerns to any and

13  all consumers who may own one of its vehicles, as it must do so regularly. *See* Exh. 34. Nissan

14  has even developed and published a tool which provides consumers with a way to "Check recall

15  by VIN." *See* Exh. 33 Further, Plaintiff Johnson has explained that because the PSR was an

16  important feature to her, she "spent a significant amount of time and effort to research several

17  vehicles and their features before selecting a car to purchase," she reviewed "safety features,

18  engine specifications, complaints from other owners, reviews, and YouTube videos concerning

19  _____

20  Cal. 2012)) As noted above, Plaintiffs have not changed their defect theory, nor are Plaintiffs
entering new allegations. Further, Nissan's cited cases are concerned with FRCP Rule 8, which

21  provide that Plaintiffs give Defendant fair notice of their claims, especially given the requirements
under Rule 9(b) to plead fraud claims with particularity. 2015 WL 12843822, at *14. However,

22  this is irrelevant here, since Plaintiffs have already pled their claims with particularity. Unlike, in
*Kaplan* where plaintiff introduced four new claims on its summary judgment motion (49 F.3d at

23  1370), or similarly in *IV Solutions* where plaintiffs introduced a new theory of fraud. 2015 WL
12843822, at *14–15. Nor do Plaintiffs find themselves in the position of those plaintiffs in *Wasco*

24  and *Poosh*, who had not met the particularity requirements of Rule 9(b). *See* 435 F.3d at 990–92
and 904 F. Supp. 2d at 1027.

25

26  [15]  Nissan's claim that Plaintiffs cannot possibly succeed in establishing an omission, or how
it would have reached Plaintiffs, is dubious in light of its recent discovery (served after its Motion)

27  asking Plaintiffs what "disclosure [they] contend Nissan should have given," and how "Nissan
should have provided [] the disclosure." Exh. 46 (Nissan's Second Set of Interrogatories

28  Propounded to Plaintiff Sherida Johnson).

19

the vehicles and/or specific features." Exh. 36 (Johnson) at 41:23-43:3; 46:3-15, 64:24–65:18; *see also* Exhs. 35(Ahrens) 55:2-11, 100:10-101:6, 107:14-108:19; 109:2-110:13, 111:23-113:4; 37 (Loury) at 54:6-59:20, 67:20-68:9; 38 (Seenarain) at 73:4-79:16; 39 (Spry) at 91:20-92:11, 93:13-94:17; 40 (Sullivan) at 35:17-36:3, 62:13-17, 63:10-64:12, 66:21-67:4. Thus, Ms. Johnson provided plenty of avenues by which she could have been informed about the Defect. "[A]s Nissan's leading case on this point makes clear, '[t]he plaintiff need only plausibly plead that they would have received the information if [the defendant] had exercised reasonable care in disseminating disclosures about the defect, not that the plaintiff has actually read and reviewed specific advertisements.'" ECF No. 207 at 3 (quoting *Baranco v. Ford Motor Co*., 294 F. Supp. 3d 950, 967 (N.D. Cal. 2018)). Indeed, all of the named Plaintiffs relay the same sentiment: had they known of the Defect they would not have bought the vehicle. *See* Exhs. 35 (Ahrens) at 107:14-108:19; 278:10-14, 280:17-25; 36 (Johnson) at 86:23-25, 167:22-168:3; 37 (Loury) at 238:1-13; 38 (Seenarain) at 334:10 335:2; 39 (Spry) at 97:25-98:7; 40 (Sullivan) at 139:3-8, 167:1-18, 170:4-19.

Nissan even takes its claimed inability to discern "what the disclosure should have been … [and] how it might have reached [Plaintiffs]" so far as to challenge Plaintiffs' standing. MSJ at 20-21. Specifically, Nissan attacks Plaintiffs' ability to prove causation, claiming that they "cannot prove what statements should have been disclosed and where and when that should have happened." *Id.* But, as above, the Defect was Nissan's use of a material for a so-called "luxury upgrade" which carries an inherent risk of spontaneously exploding during regular operation, and the omission was Nissan's knowledge and withholding of the same. *See e.g.*, SV Premium Package, NissanUSA.com (2022) https://www.nissanusa.com/shopping-tools/build-price/crossovers-suvs/rogue/2022/fwd/29475:BABdz:A3bDsCMg/packages/29475-P01 (last visited May 27, 2022) (attached to the Breit Declaration as Exh. 47) (showing a moonroof is still offered as a luxury upgrade); *see also* Exhs. 5 (Read Report) at ¶ 2, 52, 53-59; 21; 35 (Ahrens) at 53:11-54:4, 114:23-25; 36 (Johnson) at 52:18-23, 55:7-20; 37 (Loury) at 54:6-59:20, 71:16-24; 39 (Spry) at 91:20-92:11. Had Nissan decided to disclose the Defect, there is likewise abundant evidence that it is capable of doing so both for existing and prospective consumers. Exhs. 33; 34; 47. Nor do Nissan's cited authorities assist its cause. *Phillips*, for instance, considered named

plaintiffs who had not alleged that they had ever heard, or sought out, any statements regarding Apple's "wifi assist" feature, and were therefore dismissed with leave to amend to include such allegations. 2016 WL 1579693, at *6. In contrast, here, Plaintiffs have demonstrated not only that they sought out information regarding the PSRs prior to purchase (Exh. 36 (Johnson) at 41:23-43:3; 46:3-15, 64:24–65:18; *see also* Exhs. 35 (Ahrens) 55:2-11, 100:10-101:6, 107:14-108:19; 109:2-110:13, 111:23-113:4; 37 (Loury) at 54:6-59:20, 67:20-68:9; 38 (Seenarain) at 73:4-79:16 39 (Spry) at 91:20-92:11, 93:13-94:17; 40 (Sullivan) at 35:17-36:3, 62:13-17, 63:10-64:12, 66:21-67:4), but also that Nissan has several channels for communicating with its customers. Exhs. 3, 25, 33, 34. In *L.A. Taxi Coop., Inc. v. Uber Techs., Inc*., the court was concerned with misrepresentations (not omissions) between competitor-litigants (i.e., Uber and taxi cabs), and "join[ed] the majority of courts" in concluding that competitors have to allege their own reliance on allegedly misleading statements to support a claim under the UCL, rather than merely the reliance of a third-party. 114 F. Supp. 3d 852, 866–67 (N.D. Cal. 2015). Nissan's misleading quotation notwithstanding, *L.A. Taxi Coop.* has no bearing here, where Defendant made certain claims about the safety and reliability of its vehicles, without disclosing a risk it knew about in its PSRs. Finally, *TransUnion LLC v. Ramirez*, is inapplicable here because it found standing lacking for individuals who had never been affected by the claimed tortious behavior – specifically, those who were incorrectly noted internally by the defendant as a "potential match" for having a criminal record, but whose information (and this mistake) had never been disseminated or shared. 141 S. Ct. 2190, 2201-02 (2021). Plaintiffs here, however, were injured as soon as they purchased a vehicle which—due to being plagued by the Defect—were less valuable than Plaintiffs had been led to believe by Defendant's statements.

### D. Plaintiff's CLRA and UCL Claims Are Properly Venued and Do Not Require a Direct Transaction.

Nissan continues to reargue issues that have already been resolved in this lawsuit, wastefully challenging Plaintiffs' claims under California's Consumer Protection Statutes.

First, taking the untenable position that the CLRA claim does not belong in this Court, Defendant points out that it recently relocated its incorporation to Delaware, and that it does not

21

sell vehicles directly to consumers in the Northern District of California. *See* MSJ at 21-22. But, pursuant to the plain language of the CLRA, because San Francisco is unquestionably a "county in which [Nissan] … is doing business," Plaintiffs' claims are properly asserted here. Cal. Civ. Code § 1780(d); *see also* ECF No. 213-15, Declaration of Marisa Fernandez ¶ 8 ("NNA [] sells cars to authorized dealerships"); GOLDEN STATE NISSAN (2022), https://www.goldenstatenissan.com/ (last visited May 27, 2022) (NNA dealership approximately 10 miles from this Court and within the geographical range of the Northern District of California); HANLESS HILLTOP NISSAN (2022), SAN LEANDRO NISSAN (2022), https://www.hanleeshilltopnissan.com/ (last visited May 27, 2022) (same, approximately 20 miles from this Court); https://www.sanleandronissan.com/ (last visited May 27, 2022) (same). Whether or not it sells directly to the final owner, Nissan cannot reasonably claim it is not "doing business" in this District. Thus, just as alleged, Defendants' own evidence confirms that "Nissan transacts business in this District, … distributes in this district, receives substantial compensation and profits from sales, maintenance and service of affected vehicles in this District, and [through its advertising] has and continues to conceal and make material omissions in this District." 5AC ¶ 22.

Similarly tired are Nissan's arguments challenging purchases from third parties, which have been twice foreclosed by this Court:

> Contrary to Nissan's assertion, the CLRA does not require a direct transaction between plaintiffs and defendants. *See* Cal. Civ. Code § 1780(a) ("Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person . . . ."); *see also McAdams v. Monier, Inc.*, 182 Cal. App. 4th 174, 186 (2010) ("We also pause here to note that a cause of action under the CLRA may be established independent of any contractual relationship between the parties."); *Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1144 (N.D. Cal. 2005) ("Plaintiffs who purchased used cars have standing to bring CLRA claims, despite the fact that they never entered into a transaction directly with Defendant."). While Nissan claims that *Ashgari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1036 (C.D. Cal. 2013), establishes otherwise, Nissan is mistaken.

22

ECF No. 55 at 18-19; *see also* ECF No. 192 at 10-11. Nissan offers nothing to alter those rulings. *See* ECF No. 192 at 10-11 ("I am not going to revisit this issue");[16] *see also Chinatown Neighborhood Assoc. v. Harris*, 33 F. Supp. 3d 1085, 1093 (N.D. Cal. 2014) (Orrick, J.) ("The law of the case doctrine holds that 'a court will generally refuse to reconsider an issue that has already been decided by the same court . . . in the same case.") (citation omitted).

### E.   Plaintiff's Implied Warranty Claims are Supported by the Record.[17]

Defendant cannot be taken seriously when it claims that a vehicle with an unintended, unexpected, and unprotected hole in the roof—which appeared with an explosive sound and a rain of glass shards—is "[] fit for its ordinary purpose." MSJ at 23 (paraphrasing standard for implied warranty of merchantability in Colorado and New York). And even if the Defect has not yet manifested a hole in the roof of every Class Vehicle, the risk that it might is sufficient to support a claim for breach of the implied warranty of merchantability. *O'Connor v. BMW of N. Am., LLC*, Case No. 18-CV-03190-CMA-STV, 2020 WL 1303285, at *5 (D. Colo. Mar. 19, 2020). Indeed, as demonstrated by the very authority that Nissan relies on, mere allegations that excessive oil consumption *could* lead to an incident while driving (without even allegations that such an incident *had* occurred) were sufficient to support an implied warranty of merchantability in Colorado. *Id.* ("The case law is consistent that, although a vehicle is operable, it may still be unsafe and unfit for ordinary use."). Further, vehicles have been found unmerchantable where they have merely "emitted [] offensive smell[s] … [causing] headache[s] and [] sneez[ing]," and made loud noises. *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 22 (2007). Indeed, courts have specifically

---

[16]   The single new authority that Defendant offers—*Boobuli's LLC v. State Farm Fire & Cas. Co.*, Case No. 20-CV-07074-WHO, 2021 WL 7160671, at *11 (N.D. Cal. Oct. 5, 2021)—was not only available when Nissan last raised this argument and authored by this Court (so available for consideration even though Nissan failed to cite it), it has no bearing on the issues at hand. On a motion to dismiss, *Boobuli's* found that the plaintiff's UCL and unjust enrichment claims were properly plead, and that a parent company must be alleged to have controlled the actions of its "wholly owned subsidiary or that the two acted as a 'single enterprise' or had an agency relationship." *Id.* at *14 (citation omitted). Here, the Court has already upheld Plaintiffs' UCL and unjust enrichment claims, and there are no parent-subsidiary relationships at issue.

[17]   Plaintiffs have already acknowledged that they are no longer advancing an express warranty claim (ECF No. 203 at 13); its inclusion in the operative Complaint was inadvertent.

upheld merchantability claims with respect to PSRs. *Enea v. Mercedes-Benz USA, LLC*, Case No. 18-CV-02792-HSG, 2019 WL 402315, at *5 (N.D. Cal. Jan. 31, 2019)).[18]

Here, the record is replete with evidence that consumers feel unsafe, and uncomfortable using their Class Vehicles for their ordinary purpose once they learn of the Defect. Exhs. 24; 35 (Ahrens) at 278:10-14, 280:17-25; 36 (Johnson) at  86:23-25, 167:22-168:3, 188:12-190:3; 37 (Loury) at 238:1-13; 38 (Seenarain) at 334:10 335:2; 39 (Spry) at 97:25-98:25; 40 (Sullivan) 93:11-94:9, 139:3-8, 167:1-18, 170:4-19, *see also* Exh. 25 ("[S]ince her episode, Heather Savage says she can't stop worrying about all the glass overhead."). In opposition Defendant appears to argue, essentially, "what's the big deal?" *See* MSJ at 24 ("the rate at which Nissan's PSRs break is extremely low [so t]he implied-warranty claims fail."). To the extent it is able, Nissan must present such an argument to the jury; it has not established that Plaintiffs cannot support a claim for Nissan's breach of Colorado's or New York's implied warranty of merchantability as a matter of law.

### F.   Plaintiffs' Unjust Enrichment Claims Survive Defendant's Challenges.

Nissan also repeats its claims that Plaintiffs cannot pursue a claim for unjust enrichment because Nissan did nothing "unjust," and that Plaintiffs have an adequate remedy at law.[19] MSJ at 24-25; *see also* ECF No. 202 at 6-8. Initially, the parties agree: in the relevant jurisdictions a claim for unjust enrichment entails that (1) the defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant to make restitution. *See, e.g.*, *Intell. Cap. Partner v. Institutional Credit Partners LLC*, No. 08 CIV. 10580 (DC), 2009 WL 1974392 (S.D.N.Y. July 8, 2009); *see also* MSJ at 24.

---

[18]    Nissan contends California's case law should be disregarded because "that law does not apply." MSJ at 23. However, *in the next sentence*, Nissan invokes a case from Missouri, and Nissan's *Colorado* authority relies on a California opinion. *O'Connor*, 2020 WL 1303285, at *5 (citing *Ashgari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306 (C.D. Cal. 2013)).

[19]    At the outset, Plaintiffs must correct Nissan's misstatement regarding Plaintiffs' allegations in the Fifth Amended Complaint. Nissan confusingly claims that "[Plaintiffs] assert that their remedy is inadequate only when seeking injunctive relief." MSJ at 25 (citing 5AC at ¶¶ 206, 214). But Plaintiffs also assert that "they lack an adequate remedy at law" in support of their claim for "equitable unjust enrichment relief." 5AC at ¶ 197. Even Defendant's assertions about something as simple as the pleading in this case simply cannot be taken at face value.

Nissan's first argument—that it did nothing "unjust"—is readily refuted by the record. Defendant knew about consumer's concerns regarding exploding PSRs since at least November 2008, when it requested an "investigat[ion] to determine root cause of sunroof shattering." Exh. 21. Yet, Nissan continued to sell the Class Vehicles (including to all of the named Plaintiffs post-2008). *See* Exhs. 35 (Ahrens) at 100:16-101:9, 124:3-6, 137:4-11; 37 (Loury) at 57:11-58:3, 64:12-14, 192:13-15; 39 (Spry) at 128:15-18; 36 (Johnson) at 56:3-4, 38 (Seenarain) at 334:10 335:2; 40 (Sullivan) at 14:8-12, 55:2-7, 61:5-7. Nor did Nissan recall or repair the Class Vehicles, and did not even notify owners of the risk so that they could address the risk themselves. Exhs. 35 (Ahrens) at 195:11-196:9; 38 (Loury) at 149:1-151:8; 40 (Sullivan) at 123:3-11. To the extent Defendant claims it did not obtain any money for repairs (because they "are done by third parties"), it notably does not support its claim with any evidence, and fails to demonstrate that reasonable minds could not reach different conclusions from the evidence. *Addisu*, 198 F.3d at 1134 ("[r]easonable doubts as to the existence of material factual issue are resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party").

Nissan concludes by arguing, without support, that Plaintiffs may not pursue equitable relief—whether for Nissan's unjust enrichment or an injunction—because they have adequate legal remedies. MSJ at 25. But it is evident that even if Plaintiffs recovered everything available under their legal claims (e.g., damages for the reduced value of the Class Vehicles), they would not be fully and adequately compensated for their injuries. Not only do Plaintiffs explicitly seek "[a]n order requiring Nissan to adequately disclose and repair the defective panoramic sunroofs" (5AC at 98 ¶ D), but if Plaintiffs only received their legal remedies Nissan would still be allowed to retain funds that it took by selling purportedly higher-quality vehicle models (installed with PSRs), as well as the lost time-value of that money.

## V.   **CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that the Court deny Nissan's motion for summary judgment.

1

2   DATED: May 27, 2022                 Respectfully submitted,

3                                    *s/ Mitchell M. Breit*

4                                      Mitchell M. Breit (*pro hac vice*)
Leland H. Belew (SBN 293096)

5                                      **MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**

6                                      100 Garden City Plaza, Suite 500
Garden City, New York 11530

7                                      Telephone: (516) 741-5600
mbreit@milberg.com

8                                      lbelew@milberg.com

9

10                                      Gregory F. Coleman (*pro hac vice*)
Mark E. Silvey (*pro hac vice*)

11                                      Adam A. Edwards (*pro hac vice*)
**MILBERG COLEMAN BRYSON**

12                                      **PHILLIPS GROSSMAN, PLLC**
First Horizon Plaza

13                                      800 S. Gay Street, Suite 1100
Knoxville, TN 37929

14                                      Telephone: (865) 247-0080
Facsimile: (865) 522-0049

15                                      gcoleman@milberg.com
msilvey@milberg.com

16                                      aedwards@milberg.com

17

18                                      Crystal Foley (SBN 224627)
**SIMMONS HANLY CONROY LLC**

19                                      100 N. Sepulveda Blvd., Suite 1350
El Segundo, CA 90245

20                                      Telephone: (310) 322-3555
cfoley@simmonsfirm.com

21

22                                      *Attorneys for Plaintiffs*

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO NISSAN'S MOTION FOR SUMMARY JUDGMENT
3:17-cv-00517-WHO

## **CERTIFICATE OF SERVICE**

I, Mitchell M. Breit, hereby certify that on May 27, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Amir Nassihi
Andrew L. Chang
M. Kevin Underhill
**SHOOK HARDY & BACON L.L.P.**
One Montgomery Street, Suite 2600
San Francisco, California 94104
anassihi@shb.com
achang@shb.com
kunderhill@shb.com

William R. Sampson
Holly P. Smith
**SHOOK HARDY & BACON L.L.P.**
2555 Grand Boulevard
Kansas City, Missouri 64108
wsampson@shb.com
hpsmith@shb.com

*Attorneys for Defendant Nissan North America, Inc.*

DATED this 27th day of May, 2022.

/s/ *Mitchell M. Breit*
Mitchell M. Breit

PLAINTIFFS' OPPOSITION TO NISSAN'S MOTION FOR SUMMARY JUDGMENT
3:17-cv-00517-WHO