1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHERIDA JOHNSON, et al.,

Plaintiffs,

v.

NISSAN NORTH AMERICA, INC.,

Defendant.

Case No. 3:17-cv-00517-WHO

**ORDER ON MOTION FOR SUMMARY JUDGMENT, MOTION FOR CLASS CERTIFICATION, AND *DAUBERT* MOTIONS**

Re: Dkt. Nos. 135, 149, 150, 151, 213

The plaintiffs in this putative class action purchased vehicles made by defendant Nissan North America, Inc. ("Nissan").  Those vehicles had a premium feature: large panoramic sunroofs ("PSRs").  According to the plaintiffs, Nissan's PSRs are designed in a way that creates a propensity to fracture and shatter under ordinary driving conditions.  The plaintiffs brought suit against Nissan under California, New York, Colorado, Florida, and Illinois law.  They claim that Nissan violated those states' consumer protection statutes by failing to disclose the alleged defect. And they claim that Nissan violated implied warranties of merchantability because the alleged defect rendered the vehicles unfit for ordinary use.

The plaintiffs move to certify state-based classes for these claims; Nissan moves to exclude the plaintiffs' damages and technical experts and for summary judgment.  Nissan's *Daubert* motions are denied.  Nissan's motion for summary judgment is granted in part to the extent the plaintiffs seek restitution or unjust enrichment for purchases of used cars from entities other than Nissan.  It is otherwise denied: there are genuine disputes of material fact about the existence of this alleged defect, whether it would be material to reasonable consumers, whether they would rely on it if it had been properly disclosed, and the handful of other challenges Nissan makes.  The motion to certify is granted on the California, New York, Colorado, and Florida classes, though I

narrow the proposed class definitions for several of them.  Certification of the Illinois class and the plaintiffs' untimely request for certification of an injunctive-relief class are denied.

BACKGROUND

**I.      FACTUAL BACKGROUND**

Nissan manufactures automobiles.  Some of its models have PSRs.  *See, e.g.*, Report of Thomas L. Read, Ph.D. ("Read Rep.") [Dkt. No. 220-7] ¶ 17; *see also id.* ¶¶ 14–46.  A sunroof is "panoramic" when it is larger than a one-half-meter squared.  *Id.* ¶ 16.  Panoramic sunroofs are, consequently, larger than traditional sunroofs.  *Id.* ¶¶ 15–16.  The PSRs in the Nissan vehicles at issue are made from "tempered glass."  Tempered glass is heat-treated then rapidly cooled, which solidifies the surface while leaving the inside fluid.  *Id.* ¶ 22.  As a result, the core cools and contracts, pulling on the surface, creating compression and stress.  *Id.*  The PSRs use panels of curved tempered glass.  *Id.* ¶ 27.  Once the glass is curved, a ceramic print is added to the edge made of "frit" and "polymer binders" so that it can be affixed to the car's frame.  *Id.* ¶ 28.

The vehicles at issue here are the Nissan Maxima (from 2009 to 2014 and 2016 to 2020), Nissan Rogue (from 2014 to 2020), Nissan Pathfinder (from 2013 to 2020), Nissan Murano (from 2009 to 2020), Infiniti JX (2013 edition), and Infiniti QX60 (from 2014 to 2020) (collectively, the "Class Vehicles").  *See* Motion for Class Certification ("Cert. Mot.") [Dkt. No. 134-4] 2.  Each of the Class Vehicles incorporates the PSR described above.  According to the plaintiffs, the PSRs in the Class Vehicles have a "defect."  *See, e.g.*, *id.* 3.  In brief, the plaintiffs and their experts contend that the way the Class Vehicles' PSRs are designed makes them vulnerable to fracturing or shattering under normal—or, in their language, "ordinary and foreseeable"—driving conditions. *See, e.g.*, *id.* 3–6.  As described below, they assert that this shattering can be dangerous while driving.

Each of the named plaintiffs purchased either a new or used Class Vehicle.  The named plaintiffs come from, respectively, California (Sherida Johnson and Chad Loury), New York (Subrina Seenarain), Colorado (Linda Spry), Florida (Lisa Sullivan), and Illinois (April Ahrens).

According to Nissan, the Class Vehicles' PSRs are not defective.  *See, e.g.*, Opposition to the Cert. Mot. ("Cert. Oppo.") [Dkt. No. 146-18] 1.  The primary focus of the current motions is

United States District Court
Northern District of California

2

not Nissan's merits defense, so I only briefly sketch it out.  Nissan contends that the National Highway Traffic Safety Administration ("NHTSA") has set regulatory standards for automobiles that dictate how strong sunroof glass must be and how small the pieces must be when they break. *See id.* 2–3.  It contends that its PSRs are within the norm for the industry.  *Id.* 3.  It contends that there have been multiple NHTSA investigations into tempered glass in cars—though none into Nissan—and have never found that PSRs similar to Nissan's were dangerous.  *See id.* 3–4.  And it contends that only about 0.15% of its PSRs shatter (though that number is from all Nissan vehicles, not the Class Vehicles).  *Id.* 1, 4–6.

## II.    PROCEDURAL BACKGROUND

The named plaintiffs (and others who have since been dismissed) filed suit February 2017 on behalf of themselves and state-based putative classes.  Dkt. No. 1.  The case proceeded apace until the parties repeatedly agreed to delay class certification (and related motions).  *See* Dkt. Nos. 103, 112, 121, 124, 126, 129.  In February 2021, the plaintiffs moved for class certification.  In response, in June 2021, Nissan moved to exclude the plaintiffs' expert witnesses.  One of Nissan's arguments was about the California plaintiffs not having filed a statutorily required letter.  The parties therefore agreed to delay deciding the motions until the plaintiffs could move for leave to file an amended complaint and for leave to amend their expert reports.  I eventually granted the motion to amend the complaint and denied the motions to amend the expert reports.  Dkt. No. 192.  In response to Nissan's request, I permitted it to file a supplemental opposition to class certification (and the plaintiffs to file a supplemental reply) based on the amended pleadings.  The parties then again agreed to extend the class certification and *Daubert* motions.  *See* Dkt. No. 194.  Finally, in April 2022, Nissan moved for summary judgment.  I set the class certification, *Daubert*, and summary judgment motions to be heard together and held a hearing on June 29, 2022.

## LEGAL STANDARD

## I.    *DAUBERT* MOTIONS

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where: (a) the expert's scientific, technical, or other specialized knowledge will help

1    the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is

2    based on sufficient facts or data; (c) the testimony is the product of reliable principles and

3    methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

4    Fed. R. Evid. 702. Expert testimony is admissible under Rule 702 if it is both relevant and

5    reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[R]elevance

6    means that the evidence will assist the trier of fact to understand or determine a fact in issue."

7    *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558,

8    564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes

9    primarily to relevance.") (internal quotation marks omitted).

10    Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the

11    knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure

12    reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate

13    such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.*

14    These factors are "helpful, not definitive," and a court has discretion to decide how to test

15    reliability "based on the particular circumstances of the particular case." *Id.* (internal quotation

16    marks and footnotes omitted). "When evaluating specialized or technical expert opinion

17    testimony, the relevant reliability concerns may focus upon personal knowledge or experience."

18    *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

19    The inquiry into the admissibility of expert testimony is "a flexible one" in which "[s]haky

20    but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to

21    the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. The burden is on the proponent

22    of the expert testimony to show, by a preponderance of the evidence, that the admissibility

23    requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594,

24    598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 advisory committee's note.

25    **II.    MOTION FOR SUMMARY JUDGMENT**

26    Summary judgment on a claim or defense is appropriate "if the movant shows that there is

27    no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

28    law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show

4

the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## III.   MOTION FOR CLASS CERTIFICATION

"Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted). The party seeking certification has the burden to show, by a preponderance of the evidence, that certain prerequisites have been met. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–50 (2011); *Conn. Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011).

Certification under Rule 23 is a two-step process. The party seeking certification must first satisfy the four threshold requirements of Rule 23(a). Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

Next, the party seeking certification must establish that one of the three grounds for certification applies. *See* Fed. R. Civ. P. 23(b). To certify damages classes under Rule 23(b)(3), a

United States District Court
Northern District of California

1    plaintiff must establish that "the questions of law or fact common to class members predominate

2    over any questions affecting only individual members, and that a class action is superior to other

3    available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

4    23(b)(3).

5            In the process of class-certification analysis, there "may entail some overlap with the

6    merits of the plaintiff's underlying claim."  *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,

7    568 U.S. 455, 465–66 (2013) (internal quotation marks omitted).  However, "Rule 23 grants courts

8    no license to engage in free-ranging merits inquiries at the certification stage."  *Id.* at 466.  "Merits

9    questions may be considered to the extent—but only to the extent—that they are relevant to

10   determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.*

**DISCUSSION**

11

12   **I.    PERSONAL JURISDICTION**

13           In its supplemental class certification brief, Nissan argues that I lack personal jurisdiction

14   over it.  *See* Supplemental Opposition to the Motion for Class Certification ("Nissan Supp.") [Dkt.

15   No. 216] 1–2.  This case has existed for five years; Nissan is raising this issue now, it says,

16   because it ceased being incorporated in California during the course of litigation and is now

17   incorporated in Delaware (with its principal place of business in Tennessee).  *See id.* 1–2.

18           I conclude that general personal jurisdiction still exists over Nissan here.  When the case

19   was filed and when Nissan was served, and therefore brought under this court's jurisdiction,

20   personal jurisdiction was proper.  *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986), *as amended*,

21   807 F.2d 1514 (9th Cir. 1987).  That is so because general jurisdiction exists in the state in which

22   Nissan is incorporated.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919

23   (2011).  The only thing that has changed is Nissan's unilateral reincorporation elsewhere.  The

24   primary purpose of personal jurisdiction is to protect due-process rights by ensuring that a party

25   has fair notice that it will be subject to a state's jurisdiction.  *Ford Motor Co. v. Montana Eighth*

26   *Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021).  Because Nissan incorporated in California, it was

27   aware that it could be sued here for any and all of its activities.  *See id.*  That it later decided to

28   move to Delaware does not in any sense deprive it of due process.

United States District Court
Northern District of California

6

It is true, as Nissan argues, that "a class action, when filed, includes only the claims of the named plaintiff." *Moser v. Benefytt, Inc.*, 8 F.4th 872, 877 (9th Cir. 2021) (internal quotation marks and citation omitted). It is true, too, that non-named class members are not parties to the action until the class is certified. *Id.* But this is not a case, like *Moser* or any of the cases it cited, where a defendant argues at class certification that the court lacks specific jurisdiction over the claims of non-named class members once they are in the case for the first time. I do not question that the non-named class members are not parties to the action until my certification order issues. But here, crucially, *general* jurisdiction existed in the suit when it was commenced. The question is whether that jurisdiction is *lost* by unilateral reincorporation. General jurisdiction "extends to any and all claims brought against a defendant." *Ford Motor*, 141 S. Ct. at 1024. Specific jurisdiction, in contrast, is linked to specific claims. *Id.* So in cases like *Moser* and those on which it relied, the question is whether, once a non-named class member becomes a party, specific jurisdiction extends to the claims against them. Here, Nissan was subject to general jurisdiction from the outset; the question is whether that jurisdiction evaporated before today. It did not.

Nissan's argument that this court lacks personal jurisdiction over it is rejected.

## II.   *DAUBERT* MOTIONS

Nissan moves to exclude the plaintiffs' two technical experts and two damages experts.

### A.  Steven Gaskin and Colin Weir

Nissan moves to exclude the testimony of the plaintiffs' damages experts, Steven Gaskin and Colin Weir. *See* Motion to Exclude the Testimony of Steven Gaskin and Colin Weir ("Dam. Exp. Mot.") [Dkt. No. 149]. The motion is denied.

Gaskin and Weir offer a conjoint survey and analysis that, once performed, purports to show the price difference between what consumers would pay for their vehicle if they knew of the alleged defect and what they actually paid. Conjoint analyses of changing consumer willingness to pay are "often examined in the caselaw." *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 674 (N.D. Cal. 2021) (collecting citations) (Orrick, J.). They are now a "well-recognized economic method used to study and quantify consumer preferences." *In re: MacBook Keyboard Litigation*, No. 5:18-CV-02813-EJD, 2021 WL 1250378, at *5 (N.D. Cal. Apr. 5, 2021).

United States District Court
Northern District of California

In essence, the survey works by asking consumers questions that cause them to make tradeoffs between different features in a product, or with different information about the product. *See id.* Then, using statistical comparisons, the value of a particular feature (or lack thereof) can be derived. *See id.*

Gaskin's proposed survey does that. *See* Declaration of Steven P. Gaskin ("Gaskin Rep.") [Dkt. No. 135-18]. Consumers will be shown sets of product profiles that have different configurations of features. *See id.* ¶ 15. Then, they make choices between those hypothetical vehicles about whether to buy or not. *Id.* From that, Gaskin can statistically generate the "partial contribution" of a feature to the overall price. *Id.* ¶ 18. And finally, he can determine the change in market price premium for identical vehicles that do and do not have the alleged PSR defect. *Id.* Weir, in turn, opines about the reliability of this methodology and calculates the overall level of damages by multiplying the price premium from the conjoint analysis by the number of vehicles sold. *See generally* Declaration of Colin Weir ("Weir Rep.") [Dkt. No. 135-19].

### i.   Unperformed Survey

First, Nissan argues that Gaskin and Weir's opinions are unreliable because the survey has not actually been performed. *See* Dam. Exp. Mot. 6–10. Instead, Gaskin has put forward the survey he plans to perform and Weir has explained why he believes that survey is an appropriate measure of economic damages. *See* Gaskin Rep. ¶¶ 11, 13. For the reasons that follow, I reject Nissan's argument.

When a court assesses the admissibility of expert testimony, it does so to test the opinions' relevance and reliability. And to assess whether an opinion is reliable, *Daubert* instructs that courts examine the methodology underlying the opinions. That is where the analysis begins, but that is also where it ends: "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Here, Gaskin has put forward the methodology he will employ (and Weir has opined about it), so Nissan can raise challenges to it and I can exercise my gatekeeping function. *Daubert* does not require more on these facts. And, to the extent it matters, showing that a damages model is appropriate for purposes of class certification also does not require actually performing it, it just requires showing

that it meets the legal requirements for class-based damages.  *Cf. Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (discussing how damages *models* must align with theories, not completed calculations).

To be sure, results themselves can sometimes require exclusion on other grounds.  Nissan points, for instance, to a situation in which an expert produces a conjoint showing that consumers should get a full refund when a full refund has not been justified under the substantive governing law, *see, e.g.*, *Zeiger*, 526 F. Supp. 3d at 675, or when the survey results in "economically impossible" damages.  But if there is some reason that the results themselves are inadmissible here—or if they reveal a flaw in the survey apparent only once they exist—Nissan may move to exclude them *in limine*.  The plaintiffs have made a tactical choice to not perform the survey yet.  That may come with benefits to them—it saves expenses that may not have to be spent if the parties ultimately reach a settlement, for instance.  But that choice also comes with the risk that the results will come back, be challenged, and be excluded closer to trial when there is less or no time to perform another analysis.  That tactical choice was the plaintiffs' to make.[1]

Nissan also responds that "there is no evidence the survey will even show classwide damages."  Dam. Exp. Mot. 7.  At times, it frames this as an issue of the survey not yet being performed; at times it appears to tie into other objections.  *See, e.g.*, *id.*  In any event, this does not require exclusion.  If an assessment of empirical damages is properly designed then there is *always* a chance it shows that there were no damages.  Here, for instance, it might theoretically be the case that consumers would pay functionally the same amount for a vehicle with the defect as without it.  (Indeed, that is the core point of Nissan's motion for summary judgment: that there is no defect here and that, that if there is, it is not material and could not engender reasonable reliance.)  And that is all the quotations from Gaskin and Weir's depositions that Nissan points to say: a survey of consumers may show they were not damaged.  *See id.* 7–8 (quoting depositions of

---

[1] Nor does it matter that Gaskin and Weir have sometimes been excluded by other courts in other cases unless the same reasons for exclusion applied here and were persuasive.  *See* Dam Exp. Mot. 7.  And, relatedly, it does not matter if in other cases Gaskin and Weir's results have "varied wildly," as Nissan contends.  *Id.* 8.  The *Daubert* analysis in this case focuses on the particular opinions offered by the experts on these specific facts.

United States District Court
Northern District of California

Gaskin and Weir).

Some of Nissan's cases, in contrast, did not exclude similar analyses merely because they were unperformed; they were always excluded for some other reason. *See, e.g.*, *Miller v. Fuhu Inc.*, No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794, at *22 (C.D. Cal. Dec. 1, 2015) (excluding a proposed survey for being "relatively undeveloped"). I recognize that a few courts have excluded surveys (including by Gaskin) for being unperformed, *see, e.g.*, *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 578 (C.D. Cal. 2014), but they did not attempt to square their decisions with *Daubert*'s holding about focusing on methods rather than conclusions.

### ii.    Pretesting

As part of its argument about the survey being unperformed, Nissan objects to the lack of pretesting. *See* Dam. Exp. Mot. 8–10. To the extent this argument is just a subset of the one advanced above, I reject it. If Nissan's argument is that a pretest must at some point be performed, Gaskin has committed to doing one. In any event, I previously rejected the argument that a conjoint survey is necessarily unreliable under *Daubert* merely because the pretest was not sufficiently formalized. *Maldonado v. Apple, Inc.*, No. 3:16-CV-04067-WHO, 2021 WL 1947512, at *23 (N.D. Cal. May 14, 2021).

Nissan argues that a conjoint survey cannot be reliable under *Daubert* any time it is not pretested. I reject this argument too. Pretesting, as I have previously said, is a "recommended plus-factor." *Id.*; *see* Shari S. Diamond, "Reference Guide on Survey Research," REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 388 (3d ed. 2011). But Nissan cites no scientific authority suggesting it is *required* to make a conjoint survey fundamentally reliable. And many types of surveys in *Daubert* analyses are assessed based on the survey itself, not based on layer after layer of testing the test. *See, e.g.*, *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010). I see no reason, and Nissan has pointed to none, that a conjoint survey should be any different as a categorical rule. Nissan's only authority is one case that I have elsewhere explained I do not find persuasive in its *Daubert* analysis of conjoint surveys, including on the issue of pretesting. *See Maldonado*, 2021 WL 1947512, at *21 & n.11 (rejecting analysis s in *MacDougall v. Am. Honda Motor Co.*, 2020 WL 5583534, at *5 (C.D. Cal.

10

United States District Court
Northern District of California

Sept. 11, 2020) ("*MacDougall I*").  And, indeed, since I made that ruling, the Ninth Circuit has (in an unpublished opinion) also rejected that court's analysis of the admissibility of the conjoint analysis.  *See MacDougall v. Am. Honda Motor Co.*, No. 20-56060, 2021 WL 6101256, at *1 (9th Cir. Dec. 21, 2021) ("*MacDougall II*").  In any event, *MacDougall I* gave no principled reason that pretesting is a necessary requirement for conjoint surveys.

### iii.    Supply-Side Considerations

Nissan next argues that the conjoint analysis fails to adequately take account of "supply-side considerations."  *See* Dam. Exp. Mot. 10–12.  I again disagree that this requires exclusion.

Nissan identifies three alleged failures on this front.  First, it argues that Gaskin's use of the manufacturer's suggested retail price ("MSRP") improperly assumes that car dealers "would not have changed the price had warnings about the [PSR] been provided."  *Id.* 11.  This sort of argument has become a regular objection to conjoint analysis: that it improperly assumes that the supply-side of the price equation would remain static even though new information is revealed and consumer demand is changed.  *See Maldonado*, 2021 WL 1947512, at *21 (discussing issue and collecting cases).  I and many other courts have rejected similar challenges, and I reject this one.  The MSRP is an appropriate price for an expert to use in this model: it is a price the expert has decided is reasonably calculated to capture an objective value for the car in the real-world under prevailing market conditions.  It is, to be sure, both an oversimplification and an assumption.  But it is the sort that is susceptible to cross-examination.  It is quite similar to the use of "real-world" price data that I have previously upheld against *Daubert* challenge.  *See id.*

Nissan attempts to side-step *Maldonado* and the bevy of cases taking the same approach by relying on the Ninth Circuit's decision in *Zakaria v. Gerber Prods. Co.*, 755 F. App'x 623 (9th Cir. 2018), which upheld a district court's exclusion of an expert analysis of changing consumer demand for failure to consider how revealing the allegedly withheld information would alter the supply-side of the equation, changing the price level.  *Zakaria* is, to start, not binding and held only that the district court *did not abuse its discretion* in excluding the evidence on this basis.  But, more importantly, I continue to disagree with the district court's substantive analysis for the reasons I and many other judges have explained.  And more recently than *Zakaria*, the Ninth

Circuit has gone the other way, albeit also in an unpublished opinion. *MacDougall II*, 2021 WL 6101256, at *1. I find that analysis more persuasive than the conclusory one in *Zakaria*. In *MacDougall II*, the Ninth Circuit drew its reasoning about an alleged failure to consider supply-side considerations from well-established *Daubert* principles, as opposed to the curt treatment it gave in *Zakaria*. (And, in so doing, I note that that court overturned one of the only two decisions in this circuit taking Nissan's side on this issue—a decision on which the second decision in this circuit depended. *See Maldonado*, 2021 WL 1947512, at *21 n.12.)

Second and relatedly, Nissan argues MSRP is not the price "generally paid" both because automotives are often sold by negotiation and because of "promotions and incentives" that reduce the price paid. Dam. Exp. Mot. 11. This argument is unconvincing in two distinct ways. The first has already been addressed: the use of MSRP is an appropriate assumption to put into the model and Nissan can cross-examine about it. Second is that the point of a conjoint analysis is to determine the price *differential* between what was paid and what would be paid if the alleged misrepresentation were cured. *See, e.g.*, Gaskin Rep. ¶ 18. So no matter the precise baseline price, what matters is that it is consistent. The jury, or if appropriate the court, can then adjust it based on all of the evidence and argument.

Third, Nissan argues that Gaskin includes non-comparable vehicles, such as those without sunroofs, in the survey. But that choice—which is intended to help measure the value of a sunroof and, so, makes some sense anyway—is just one type of "attribute selection" that goes to weight and not admissibility. *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).

### iv. Miscellaneous Alleged Methodological Errors

Nissan also identifies several alleged methodological errors in the survey design. *See* Dam. Exp. 13–16. None requires exclusion.

First, Nissan challenges the population that Gaskin intends to survey; it argues that he would improperly survey individuals who (1) purchased cars other than Nissan models and (2) bought or leased cars without sunroofs. *See id.* 13–14. I conclude that, on these facts, with this particular survey, these criticisms go to weight. In general, purported flaws in survey design and attribute selection will usually go to the weight a jury accords the survey, not whether the jury can

United States District Court
Northern District of California

be shown it in the first place.  *See Fortune Dynamic*, 618 F.3d at 1036; *Wendt*, 125 F.3d at 814.

Here, Gaskin explained in his deposition why he included non-Nissan car buyers in the survey: the

relevant market for pricing the cars with the alleged defect is *all* similarly situated cars, not just

Nissans.  *See* Dkt. No. 169-3 at 230:21–24.  Nissan has offered no reason that this choice renders

the survey unreliable as a matter of law, or why Gaskin is so wrong that the jury cannot be trusted

to evaluate the merits of its objections.  Nissan's second objection—Gaskin's inclusion of cars

without sunroofs—is not persuasive for the same reasons: there is sufficient indication that prices

are influenced by cars with and without sunroofs.

Second, Nissan challenges Gaskin's characterization of the defect and hypothetical

alternative vehicles.  In particular, it objects to the inclusion of a vehicle with a sunroof that "will

not spontaneously shatter under normal driving conditions," to the use of "spontaneous" to

characterize the alleged defect, and to the vagueness of the characterization of sunroofs with a

"very small chance" of shattering.  Dam. Exp. Mot. 14 (quoting Gaskin Rep. ¶ 21).  All of these

are for cross-examination, not exclusion.  Courts have generally rejected similar linguistic

challenges under *Daubert*.  *See, e.g.*, *Fortune Dynamic*, 618 F.3d at 1036 (holding that the "format

of questions" and the "manner" of them generally go to weight).  These survey conditions stem

directly from the plaintiffs' theory of liability.  While Nissan is correct that all glass shatters under

some set of conditions, Gaskin's survey choice does not improperly ignore that reality: he includes

only an option for glass not shattering *under normal driving conditions*.  And while "very small

chance of shattering" is not precisely defined, that is appropriate because the argument here is that

substantive consumer protection law was violated when this alleged truth was not revealed to

consumers.  Indeed, a jury could reasonably conclude that a qualitative descriptor of "very small

chance" is likely more helpful to many consumers than a quantitative one.

Third, Nissan objects that the prices are only of *new* vehicles, ignoring the many people

who buy vehicles used.  Dam. Exp. Mot. 15.  For *Daubert* purposes, this is a quintessential issue

of weight, not admissibility.  To the extent the argument sounds in concerns about predominance

or the suitability of the damages model for class-wide treatment, I address that issue below in the

class certification analysis.  *See infra* Section IV.C.

13

Last, Nissan argues that, in the real world, consumers make car buying decisions based on the complex interplay of numerous factors, yet Gaskin "artificially focuses" the survey respondents on the single feature of a sunroof. Dam. Exp. Mot. 15–16. But the point of the conjoint analysis is to take into account a multitude of factors then determine the value *difference* between the product with and without the revealed information, all else held equal. And, as noted, conjoints have often been approved for that precise purpose. *See, e.g.*, *In re: MacBook Keyboard Litigation*, 2021 WL 1250378, at *5. This argument too is for the jury.

### v.   Automobiles

Finally, Nissan goes broad: it argues that conjoint surveys are *never* reliable in the context of buying an automobile. Mostly, however, this is just a retread of the final part of the argument just rejected—that buying a car entails a uniquely high number of factors to consider. For the reasons explained, I reject it. *See supra* Section II.A.iv. The other part of this argument appears to be that consumers sometimes buy cars for one or a few idiosyncratic reasons that overwhelm all others—Nissan pulls an example from a publication Gaskin wrote of someone who chooses a car because "they look good while driving it." Dam. Exp. Mot. 17 (quoting Steve Gaskin, *Navigating the Conjoint Analysis Minefield*, VISIONS, at 24 (1st Quarter 2013)). But that could be said for many products, including others that conjoint analyses have been found to be reliable in assessing. If that is so, moreover, it is the job of the conjoint to suss it out and the jury to weigh it. With the example of someone who buys a car *solely* to look "good" in, for instance, presumably the price difference resulting from the sunroof shown in the survey would just be zero.

### B.  Neil Hannemann

Nissan moves exclude the opinions of one of the plaintiffs' technical experts, Neil Hannemann. *See* Motion to Exclude the Testimony of Neil Hannemann ("Hannemann Mot.") [Dkt. No. 150]. It argues that he is unqualified to offer the opinions he does and that those opinions are unreliable. Hannemann's qualifications and methodology are described below as they become relevant. In brief, Hannemann is an automotive engineer who offers opinions about PSRs, their manufacturing, and the alleged defect. *See generally* Report of Neil Hannemann ("Hannemann Rep.") [Dkt. No. 134-7]. To reach this conclusion, he reviewed design documents

United States District Court
Northern District of California

from Nissan about the PSRs, *see id.* ¶¶ 19–23 & nn.1–16, depositions of individuals, *see, e.g.*, *id.* ¶ 19, evidence of the shattering in some of the plaintiffs' vehicles, *see, e.g.*, *id.* ¶ 26 n.21, and consumer complaints and a governmental report on the shattering, *see, e.g.*, *id.* ¶¶ 32 & nn.25–26.

### i.   Qualification

Nissan first argues that Hannemann is not qualified to opine about glass and PSRs. Hannemann Mot. 4–6.  I disagree.

Hannemann is an automotive engineer with roughly 40 years' experience.  Hannemann Rep. ¶ 7.  He holds a bachelor's degree in mechanical engineering.  *Id.*  He has been an engineer at multiple car companies, including as chief engineer at Ford.  *Id.* ¶ 11.  He states that he has worked in all stages of design, analysis, testing, and development of cars.  *Id.* ¶ 9.  This experience includes working several times with the glazing—that is, glass installation—process and on roof design.  *Id.* ¶¶ 7–16.

Nissan argues that Hannemann is not sufficiently well-qualified in the area of glass and PSRs *specifically*, despite his broader experience in automotive engineering.  Hannemann Mot. 4–5.  The general rule is that "[c]ourts do not prevent experts from testifying merely because, though otherwise qualified, they do not have expertise in some hyperspecialized corner of their field that they are competent to testify in from their more general expertise."  *Maldonado*, 2021 WL 1947512, at *17 (citations omitted).  Said otherwise, lack of specialization is an issue of weight, not admissibility, "as long as an expert stays within the reasonable confines of his subject area." *Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (internal quotation marks and citation omitted).  But I and other judges have also explained that engineering is a particularly broad field in which qualification for one type of engineering does not necessarily lead to expertise in another.  *See Maldonado*, 2021 WL 1947512, at *17 (collecting cases).

Here, Hannemann is sufficiently qualified to offer the particular opinions he does. Hannemann is not testifying about (for example) the chemistry of the glass or the technical specifications of the installation process.  Instead, he opines about (1) the basic specifications of the PSRs here, (2) general automotive engineering principles that require that vehicles be able to withstand "foreseeable challenges," (3) the challenges PSRs must withstand, (4) that some

15

1    accounts of users illustrate the PSR defect, (5) this type of shattering that is rare in his four

2    decades of experience, (6) the shattering events are a safety hazard, and (7) the defect which could

3    have been sufficiently easily avoided as to constitute a design defect and therefore was

4    unreasonable under the circumstances.  *See* Hannemann Rep. ¶¶ 20–41.  None of these opinions

5    stem from the hyper-specialized glass-based expertise that Nissan would require.  They are

6    properly drawn from Hannemann's long experience as an automotive engineer.  And, indeed, that

7    is why the plaintiffs have offered another expert to opine about the more technical issues.

8                    **ii.    Reliability**

9            Nissan also moves to exclude several of the opinions that Hannemann offers as unreliable

10   under *Daubert*.  *See* Hannemann Mot. 6–11.  I again disagree.

11           First, Nissan challenges Hannemann's opinion that there is a defect in the vehicles no

12   matter the frequency that they result in shattering.  *Id.*  One court has excluded Hannemann's

13   opinion for failing to articulate what would be an acceptable shatter rate.  *See Kondash v. Kia*

14   *Motors Am., Inc.*, No. 1:15-CV-506, 2020 WL 5816228, at *9 (S.D. Ohio Sept. 30, 2020).  But I

15   see no reason he would have to on these facts.[2]  While the quantitative measure of rates of

16   shattering that are acceptable might be one appropriate measure for an alleged defect, so too is the

17   *qualitative* measure of being unable to shatter under normal driving conditions.  *Cf. Williams v.*

18   *Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (discussing the reasonable consumer

19   standard).  As I explain below in the section on summary judgment, that is an appropriate alleged

20   defect for purposes of the consumer protection laws and fits an implied warranty of

21   merchantability theory as well.  *See infra* Section III.B.  In other words, it is appropriate, on these

22   facts and under these theories of liability, for an expert to opine that a defect exists when a product

23   cannot perform its expected function under ordinary conditions; a jury is fully capable of

24   evaluating that sort of qualitative statement.[3]

25   _____

26   [2] That court was assessing a specific opinion about expectations of a lower shatter *rate*; the
     opinion here, as described in-text, is different.  *See Kondash*, 2020 WL 5816228, at *9.

27   [3] To Nissan, endorsing this theory means that even "[o]ne failure" is enough to make a product
28   defect.  Hannemann Mot. 6–7.  That overstates things dramatically.  Hannemann's opinion is that
     there is something in the design that renders the product liable to shatter under ordinary driving

United States District Court
Northern District of California

1    Relatedly, Nissan critiques Hannemann for failing to examine particular failures and

2    having insufficient data.  He did, though, examine consumer complaints submitted to the

3    government about the shattering and he examined the design of the windshield at issue.

4    Hannemann Rep. ¶¶ 26, 35.  This purported weakness in Hannemann's opinion may go to its

5    weight, but it does not make it unreliable.  Another court rejected a *Daubert* challenge to

6    Hannemann on this ground.  *See Beaty* v. *Ford Motor Co.*, No. C17-5201 TSZ, 2021 WL

7    3109661, at *4 (W.D. Wash. July 22, 2021).

8    Nissan also argues that Hannemann's opinion about the dangerousness of shattering glass

9    is unsupported by actual evidence.  Hannemann Mot. 8–9.  But that conclusion just requires two

10   uncontroversial premises: (1) shattering glass while driving can reasonably be distracting and (2)

11   distracted driving is dangerous.  For the second conclusion, Hannemann relies explicitly on his

12   experience engineering automotives with the understanding that distracted driving is dangerous.

13   *See* Hannemann Rep. ¶ 32 & n.27 (citation omitted).  And the jury is more than capable of

14   assessing the first statement, which is relatively commonsensical and, in any case, is one that

15   Hannemann supports with a real consumer complaint.  *See id.* ¶ 32 n.25.

16   Nissan contends that Hannemann's opinions contradict the fact that the government has

17   conducted investigations into the alleged defect and not announced that it found one and that the

18   NHTSA has permitted the use of tempered safety glass in panoramic sunroofs.  *See* Hannemann

19   Rep. 9–10.  But whether a sunroof adheres to regulatory requirements is a different question than

20   the one here.  Reasonable consumers might be misled under California's consumer protection laws

21   even if a product adheres to a regulatory standard.  *Cf. Zeiger*, 526 F. Supp. 3d at 681 (so holding

22   with respect to FDA regulations and consumer protection law).  Hannemann has reasonably

23   articulated the basis for his opinions; Nissan is free to pair them off against NHTSA's, but

24   balancing those potentially competing conclusions is a matter for the jury.

25   **C.  Thomas Read**

26   Nissan moves to exclude the opinions of Nissan's other technical expert, Dr. Thomas

27

28   _____
     conditions.

17

Read.  *See* Motion to Exclude the Testimony of Thomas Read ("Read Mot.") [Dkt. No. 151].  It

argues that (1) he is unqualified, (2) his opinions about glass are unreliable, and (3) his opinions

about "fractography"—the study of the fracturing of a material—are unreliable.  *See generally id.*

Read's qualifications and methodology are described below as they become relevant.  In brief, he

is an expert in materials science and engineering.  *See* Read Rep.  ¶¶ 5–13.  He opines about the

design and manufacturing of the PSRs, *see id.* ¶¶ 18–31, the scientific study of failures (shattering

and fracture) in glass, *id.* ¶¶ 33–46, his inspection of 19 Nissan PSRs that failed, *id.* ¶¶ 47–49,

potential causes of such failure, *id.* ¶¶ 50–52, his opinion that the PSRs in the inspected vehicles

suffered from a "common defect"—namely the design choices Nissan made, *id.* ¶¶ 53–59, and

alternative design choices available, *id.* ¶¶ 60–69.

### i.  Qualification

Nissan first argues that Read is not qualified to offer opinions about PSRs.  Read Mot. 6–7.

I disagree.  Read has a Ph.D. in materials science and engineering, a Master of Science in

materials science, and a Bachelor of Science degree.  Read Rep. ¶ 5.  He has spent more than 40

years working with glass specifically.  *Id.* ¶¶ 6–8.  He has done so in a variety of contexts,

including in consumers products and electronics.  *Id.*  He developed glass-related processes for use

in space shuttles.  *Id.* ¶¶ 7–8.  And in preparing to form his opinions here, his report shows that he

has studied automotive glass and PSRs in particular.  As noted, engineering is a broad field or set

of fields, but Read is not just a materials engineer (which would already be relatively specialized)

but has focused mainly on glass, including for use in moving vehicles, for decades.  Then, he used

that on-point experience to study up about automotive PSRs in particular.  He is qualified within

the meaning of the Federal Rules of Evidence.[4]

### ii.  Reliability of Glass Opinions

Nissan moves to exclude Read's opinions about glass and PSRs as unreliable under

---

[4] Nissan argues that Read and Hannemann are "no more qualified than they were in" *Kondash v. Kia Motors Am., Inc.*, No. 1:15-CV-506, 2020 WL 5816228 (S.D. Ohio Sept. 30, 2020).  But that court did not exclude them for being unqualified, it excluded several specific opinions for being unreliable.  *See, e.g.*, *id.*, at *11.

United States District Court
Northern District of California

*Daubert*.  Read Mot. 7–14.[5]  It argues that Read's opinion about the cause of the alleged shattering is unreliable.  As I explain, some portions of Read's deposition do indeed give me pause (as I indicated in my tentative ruling in advance of the hearing).  But, ultimately, I conclude that Read's opinions are sufficiently well explained in his report that any issues on this front will go to weight and are for the jury to assess.

The relevant portion of this opinion is that the defect in the PSRs arises from the "combination" of glass temper, thickness, size, curvature, the way it is connected to the frame, and the frit.  *See, e.g.*, Read Rep. ¶¶ 2, 54.  Nissan argues that there is not a sufficient explanation of how these individual components leads to the conclusion.  On the whole of the record, I disagree for *Daubert* purposes.  Read's report explains that, in tempered glass, "if even the smallest surface flaw penetrates through the outer compressive layer, the tensile stresses in the core are released and the entire glass panel shatters."  *Id.* ¶ 25.  It explains that applying the frit "interferes" with the tempering process and "caus[es] sections of the glass to cool at different rates," leading to uneven temper and "weakening" of the glass.  *Id.* ¶ 29.  It explains that curving the PSRs also creates "anomalies" in air flow during the cooling process that result in an "imbalance" that, again, can cause breakage more easily.  *Id.* ¶ 30.  It explains at length about how glass can fail progressively when stresses are added and that proper fractography can determine whether a failure was indeed progressive.  *See id.* ¶¶ 33–46.  It explains that, based on Read's fractographic analysis of Nissan PSRs and his review of consumer complaints, he concludes that the failures were progressive.  *Id.* ¶¶ 47–49.  Finally, it explains that the various factors discussed can contribute to the stress and lead to a greater chance of progressive facture.  *Id.* ¶¶ 52A–53F.  All of this together convinces me that there is no "analytical gap between the data and the opinion proffered" that would require exclusion, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), nor are the opinions unreliable under *Daubert.*

It is true, as alluded to above, that there are statements in Read's deposition to the effect

---

[5] Some of Nissan's argument is duplicative of or substantially overlaps with its objections to Hannemann's related opinions.  Nissan again raises its argument about the lack of an acceptable failure rate, or any failure rate.  Mot. 7–8.  For the reasons explained, a qualitative opinion about the defect is appropriate.  *See supra* Section II.D.

United States District Court
Northern District of California

1    that he cannot pinpoint the precise effect that any of these individual components (thickness, frit,

2    etc.) had on the weakness of the PSRs.  *See, e.g.*, Dkt. No. 157-5 at 71:10–19 (testifying that he

3    did not know the "exact influence" or "any influence" the frit had on the glass); *see also* Read

4    Mot. 8 (collecting quotations).  Though the issue is not open and shut, I conclude these statements

5    go to the weight of the opinions.  Even if Read does not know the *exact* effect that each individual

6    element had to the overall propensity to shatter, he sufficiently opines that each element does have

7    such an effect and that, together, they create a defect.  As laid out above, those opinions are

8    sufficiently explained in his report.

9         Nissan also argues that Read did not "test[] his hypothesis."  Read Mot. 8.  That objection

10   goes to weight.  *Daubert* generally requires *testability* and this is not the sort of opinion that

11   needed to be physically tested, in part because Read was analyzing physical products that had

12   already broken down using established scientific techniques.  *Cf. Ramirez v. ITW Food Equip.*

13   *Grp., LLC*, 686 F. App'x 435, 440 (9th Cir. 2017) ("The reliability of an expert's theory turns on

14   whether it can be tested, not whether he has tested it himself.") (internal quotation marks, citation,

15   and alteration omitted).  And while Nissan makes an extensive argument about the merits of its

16   own experts' opinions being based on physical testing, *see* Read Mot. 8–12, that battle of the

17   experts is for the jury.

18                        **iii.  Reliability of Fractography Opinions**

19        Nissan moves to exclude Read's opinion that the failures in the glass were "progressive"

20   (rather than immediate) based on his application of "fractography," which both parties accept is

21   (in general) a reliable method of analyzing the breakage of glass.  Read Mot. 14–19.  But Nissan's

22   argument is built on a false premise, that *its* expert's opinion about this is correct.  Although

23   Nissan takes several shots at certain steps Read performed to analyze 19 shattered sunroofs, its

24   substantive reason for thinking he erred is that its own expert found that only three of them

25   showed progressive failure while Read concluded that all did.  *See id.* 15–16.  And the reason that

26   Nissan offers to invalidate Read's finding is that its own expert relied on so-called "tertiary

27   Wallner lines."  *Id.*  A Wallner line, the parties appear to agree, are lines that form in the glass and

28   curve in the direction it cracks.  And a tertiary Wallner line, it appears, comes from shock waves

of impact, rather than other things that might cause the crack.  This is for cross-examination.  Read

opines that he correctly applied fractography and has explained his reasoning.  Whether the

presence of tertiary Wallner lines defeats those opinions is for the jury.

### D.  Conclusion

Nissan's *Daubert* motions are DENIED.

## III.   MOTION FOR SUMMARY JUDGMENT

Nissan moves for summary judgment on the individual claims.  *See* Motion for Summary

Judgment ("SJ Mot.") [Dkt. No. 212-2].  The plaintiffs bring two broad types of claims under the

laws of each of the states at issue: claims under consumer protection statutes and under statutes

creating an implied warranty of merchantability.  *See generally* Fifth Amended Complaint [Dkt.

No. 208].  The plaintiffs also bring claims in the nature of unjust enrichment, which sometimes are

listed as stand-alone claims and sometimes are the remedy for violation of the substantive laws.

*See generally id.*

### A.  Existence of Defect

Nissan first argues that it is entitled to summary judgment because the plaintiffs cannot

prove that there is a "defect" in the PSRs.  SJ Mot. 11–13.  Indeed, Nissan argues that the

plaintiffs have not even clearly identified what alleged defect is at issue.  *Id.* 11.  And in its

supplemental brief, it argues that the amended pleadings still do not align with the theory the

plaintiffs put forward for class certification.  *See* Nissan Supp. 3–4.  I disagree.

One preliminary point needs making.  The claims at issue are not products liability claims.

They are either consumer protection claims or warranty-of-merchantability claims.  So the

plaintiffs are under no obligation to establish that there is necessarily a defect in the sense that

products liability law uses that term—such as, for instance, "design defect" under California law.

*See, e.g.*, *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120, 123 Cal.Rptr.2d 303

(2002) (discussing products liability defects).  Instead, a "defect" is relevant to the consumer

protection claims only to the extent that it shows it is something that Nissan was obligated to

disclose or misrepresented.  *Cf. Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267, 1287 (C.D.

Cal. 2016) (discussing some differences between the two types of bodies of law).  To this extent, I

reject both parties' occasional use of products-liability defects theories like the consumer expectations test or the risk-benefit test.  The consumer protection statutes at issue have their own legal tests, which generally are based on whether reasonable consumers would be misled.  The merchantability statutes likewise impose their own legal test, generally based on whether a product is fit for ordinary use.

On the merits of Nissan's argument, I first disagree with it that the plaintiffs have not articulated what the alleged "defect" is.  *See* SJ Mot. 11–13 (making this argument).  The plaintiffs allege that PSRs in specified models of Nissan vehicles have a propensity to shatter (due to progressive damage) under normal driving conditions.[6]  *See, e.g.*, Dkt. No. 134-4 at 1 (first page of motion for class certification arguing that the defect is PSRs that are "unable to withstand the stresses . . . present under ordinary driving conditions").  I take Nissan's point that, at various times, language like "design defect" or "manufacturing defect" has been tossed around.  But the alleged "defect" has been clear for a long time, and has been at least clear enough that both parties were able to produce extensive expert reports on the subject and for Nissan to be able to confidently assert that its PSRs are not defective in this way.

I also disagree with Nissan that it is entitled to summary judgment on the existence of this defect.  *See* SJ Mor. 11–13.  Both of the plaintiffs' experts have opined that the PSRs fail under normal driving conditions, which is sufficient to survive summary judgment on its own.  *See generally* Read Rep., Hannemann Rep.; *see also supra* Section II.B–C (discussing those experts' opinion).  As explained above, I deny Nissan's motions to exclude those opinions.  *See supra* Section II.B–C.  Still more, the plaintiffs have introduced evidence that consumers filed complaints about this issue, introduced reports about the shatterings, and introduced the named plaintiffs' descriptions of the events.  *See, e.g.*, Opposition to the SJ Mot. ("SJ Oppo.") [Dkt. No. 218-3], Exs. 25, 35–40; *see also, e.g.*, Hannemann Rep. ¶¶ 32 & nn.25–26.  In a similar case, the Ninth Circuit recently reversed a district court's grant of summary judgment based *solely* on this type of non-expert evidence.  *Beaty v. Ford Motor Co.*, 854 F. App'x 845, 848 (9th Cir. 2021).

---

[6] Here, I take "normal" and "ordinary" to be essentially interchangeable; I also do not intend to create any difference from "normal and foreseeable" or a similar formulation.

1   Although that opinion is unpublished and non-binding, I find it persuasive as it is a

2   straightforward application of standard summary-judgment principles.  *See id.*

3          Based on this evidence, there is a genuine dispute of material fact about whether the

4   alleged defect exists.

5          **B.  Materiality**

6          Nissan argues that the plaintiffs cannot show that any alleged omission of this information

7   was material, which it must be to be actionable under the consumer protection statutes.  SJ Mot.

8   13–17.  I again disagree.

9          Under each of the state consumer protection statutes at issue here, the alleged

10  misrepresentation (including a misrepresentation by omission) must be material.  Each state uses

11  the same nucleus of a legal test: they ask whether the information is material to or likely to

12  mislead a "reasonable consumer."  *See Gerber*, 552 F.3d at 938 (California); *Oswego Laborers'*

13  *Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995) (New York);

14  *Mazella v. Coca-Cola Co.*, 548 F. Supp. 3d 349, 356 (S.D.N.Y. 2021) (same); *Carriuolo v. Gen.*

15  *Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) (Florida); *Connick v. Suzuki Motor Co.*, 174 Ill.

16  2d 482, 505 (1996) (Illinois, discussing objective standard); *Rhino Linings USA, Inc. v. Rocky*

17  *Mountain Rhino Lining, Inc.*, 62 P.3d 142, 148 & n.11 (Colo. 2003) (Colorado, relying on other

18  consumer protection materiality standards that include reasonableness).  Although there are some

19  differences in broader materiality standards, the parties focus only on this aspect, except for one

20  issue explicitly discussed below.

21         Here, a jury could find that a reasonable consumer would consider the alleged defect

22  material.  It is reasonable to believe that consumers, as a general matter, expect sunroofs not to

23  shatter under normal driving conditions.  The evidence offered by the plaintiffs, if credited, would

24  allow the jury to find that certain Nissan models had PSRs that shattered under normal driving

25  conditions.  *Cf. Beaty*, 854 F. App'x at 849–50 (reversing summary-judgment determination on

26  materiality and finding that "a reasonable juror could find that even a small risk that a PSR might

27  explode without warning is a material fact").  This is likely to be material to a reasonable

28  consumer both for its own sake (as it requires replacing a car part) but also because overhead glass

United States District Court
Northern District of California

shattering while driving is an obvious safety issue.  Not only might it cause damage on its own, the sound and shower of glass might cause a driver to drive dangerously or lose control due to alarm.

To resist this, Nissan argues that the risk of shattering is "minuscule."  SJ Mot. 14.  That, however, is a matter for the jury.  A reasonable jury could find that Nissan still should have disclosed the risk—at least because any consumer might fall within that group, even if it is small.  I recognize that another court has concluded that reasonable consumers would not think this a material risk in light of it being a mere possibility and the reality that "[a]ll objects made of glass shatter."  *Anderson v. Ford Motor Co.*, 2020 WL 1853321, at *3 (W.D. Mo. Feb. 14, 2020).  In my view, though, this reasoning points in the opposite direction: these are the sort of contextual, fact-laden, and contested considerations that a jury, not a judge, must consider.  I, again, instead agree with the Ninth Circuit that this is a triable issue of fact.  *Beaty*, 854 F. App'x at 849.

Last, Nissan argues that the plaintiffs have not shown that there is a safety risk.  SJ Mot. 16–17.  For the reasons explained, I would disagree even without expert evidence, based solely on what should really be uncontroversial common sense.  But there is also expert evidence on this point: Hannemann's report states that glass suddenly raining down from overhead while operating a motor vehicle accompanied by a loud noise is a plausible safety risk.  *See* Hannemann Rep. ¶ 32.

## C.  Reliance

Nissan argues that it is entitled to summary judgment because the plaintiffs cannot demonstrate the reliance required under the consumer protection statutes.  SJ Mot. 17–21.

The parties appear to agree that each of the consumer protection statutes at issue requires reliance, so I assume for present purposes that they do.  *See id.*; SJ Oppo. 17–18 (arguing that reliance standards are met).  I also assume for present purposes, based again on the parties' shared understanding, that the principle for reliance on an omission under California law is essentially the same across all statutes.  *See* SJ Mot. 18–19 (relying on cases applying California law); SJ Oppo. 17–18 (same).  Under that standard, "[t]o prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct."  *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015).  But the cause need

United States District Court
Northern District of California

1    only have been a "substantial factor." *Id.* The plaintiff can demonstrate reliance "simply by

2    proving that, had the omitted information been disclosed, one would have been aware of it and

3    behaved differently." *Id.* (internal quotation marks and citation omitted). And, so long as the

4    omission is material, plaintiffs are entitled to a presumption or inference of reliance. *Id.*

5         The plaintiffs have put forward sufficient evidence from which a jury could infer reliance

6    to defeat Nissan's motion for summary judgment. Each of the named plaintiffs has submitted a

7    declaration that, had they known of the alleged defect, they would not have purchased their

8    vehicles. *See* SJ Oppo. 20 (collecting citations). Johnson, for instance, avers that she conducted

9    significant research before purchasing a vehicle and that the sunroof feature was important to her.

10   *See id.*, Ex. 36 at  41:23–46:15, 64:24–65:18. And a jury could reasonably find that, if Nissan

11   adequately disclosed the defect, the named plaintiffs would have known of it. *Cf., e.g.*, *Sloan v.*

12   *Gen. Motors LLC*, 287 F. Supp. 3d 840, 875 (N.D. Cal. 2018) (Chen, J.); *Baranco v. Ford Motor*

13   *Co.*, 294 F. Supp. 3d 950, 967 (N.D. Cal. 2018) (Chen, J.). Certainly, the information could be

14   disclosed in Nissan's direct advertising materials and/or in materials provided to consumers by

15   Nissan at time of purchase. But even for those named plaintiffs that purchased the cars used, a

16   jury could find the information would have reached them. At the very least, it is reasonable to

17   infer (as I must at this stage) that used car dealers would disclose potential safety hazards when

18   properly informed by Nissan.[7] Nor does it matter, as Nissan argues, *see* SJ Mot. 20, that various

19   plaintiffs admitted that they did not read particular Nissan literature or view ads; the question on

20   an omissions claim like this is not whether a plaintiff viewed a particular communication, but

21   whether a jury could find that the information would have been relied on if disclosed. *Daniel*, 806

22   F.3d at 1225. This is, in short, still a nondisclosure case and Nissan's attempt to transform it into a

23   misleading affirmative statement case and dismiss it on that basis is unconvincing.

24        **D.  CLRA and UCL Claims**

25        Nissan contends that it is entitled to summary judgment on the claims for violation of two

26   of the California consumer protection statutes at issue, the Consumers Legal Remedies Act

27

28   _____
     [7] Nissan appears to attempt to renew its argument that the alleged fraudulent omission was not
     adequately *pleaded*. I rejected that argument at the pleadings stage. Dkt. No. 207.

United States District Court
Northern District of California

1   ("CLRA") and the Unfair Competition Law ("UCL").  *See* SJ Mot. 21–22.

2         **i.   CLRA Venue**

3         The CLRA requires a plaintiff in a damages action to file an affidavit showing that the

4   action has been commenced in the proper county.  Cal. Civ. Code § 1780(d).  It provides that the

5   action can be commenced "in the county in which the person against whom it is brought resides,

6   has his or her principal place of business, or is doing business, or in the county where the

7   transaction or any substantial portion thereof occurred."  *Id.*  Both parties treat this requirement as

8   applying in federal court, so I assume without deciding that it does.  Nissan argues that summary

9   judgment is appropriate for Johnson's CLRA claim (the only one in the case) because venue is

10  improper here.  *See id.*

11        Nissan reasons that it is not incorporated in California, it does not have its principal place

12  of business in California, the transaction of Johnson's vehicle occurred in Riverside County, and

13  Nissan "is [not] doing business" in this county—which are the only ways to render a place the

14  right CLRA venue.  *See* Cal. Civ. Code § 1780(d).  The plaintiffs reply that Nissan *is* "doing

15  business" in this county because there are Nissan dealerships within this county, for which they

16  have submitted evidence of.  *See* SJ Oppo. 22 (collecting citations).

17        Neither party has presented any authority on whether a car company "do[es] business" in a

18  county within the meaning of the statute by having dealerships there.  Dealerships are

19  independently owned (and there is no evidence on the record that Nissan owns these ones).  *See,*

20  *e.g.*, *Watson v. Ford Motor Co.*, No. 18-CV-00928-SI, 2018 WL 3869563, at *4 (N.D. Cal. Aug.

21  15, 2018) (discussing relationship between dealerships and manufacturers).  But a car

22  manufacturer's relationship with a dealer is not like the relationship between two disinterested and

23  unrelated businesses carrying out a normal, arms-length commercial transaction.  Among other

24  things, dealers use car makers' trademarks and trade dress and exclusively sell their products.

25  They are tightly bound up together.  In the absence of any guidance from the California courts, I

26  agree with the plaintiffs that Nissan "is doing business" in this county by transacting with dealers

27

28

1    here for these reasons.[8]

2         **ii.  Restitution/Unjust Enrichment**

3         Nissan seeks summary judgment on the UCL claims and the CLRA claim to the extent that

4    they seek restitution or unjust enrichment because, according to it, the California named plaintiffs

5    "bought used vehicles and so cannot show Nissan received any money from those sales that could

6    be 'restored' to Plaintiffs" as required for a restitution claim.  SJ Mot. 22.  The plaintiffs' response

7    misunderstands the issue; they cite my earlier determinations in this case that, to have an

8    actionable CLRA claim, there need be no direct transaction between the plaintiffs and Nissan.  *See*

9    SJ Oppo. 21–23 (citing Dkt. Nos. 192, 55).  Nissan's argument here is different; it is that

10   restitution seeks to restore something unjustly gained by the defendant to the plaintiff, which

11   cannot occur on facts like these.  *See, e.g.*, *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp.

12   3d 1306, 1323–25 (C.D. Cal. 2013).  Due to this reality and the plaintiffs' lack of a responsive

13   theory that overcomes it, I will grant summary judgment to Nissan to the extent that the plaintiffs

14   seek restitution for used cars purchased from entities other than Nissan.[9]

15        **E.  Implied Warranty Claims**

16        Nissan argues that it is entitled to summary judgment on the implied warranty of

17   merchantability claims brought under California and New York law.  *See* SJ Mot. 22–24.  I

18   disagree.  The core of Nissan's argument is that the plaintiffs have no evidence to show, as they

19   must, that the vehicle was not fit for ordinary purpose.  *See id.*  A jury, however, could find that an

20   appreciable chance of the sunroof shattering under normal driving conditions renders a vehicle not

21   fit for ordinary purpose.  The reasons are fundamentally the same as those discussed above about

22   the potential safety risks of the shattering for purposes of the consumer protection laws.  *See supra*

23

24   ─────────────────

25   [8] Nissan was previously a California corporation earlier in this case.  I am highly skeptical that it
     could leave the venue that way and render it improper for CLRA purposes if the venue were
26   correct when suit began.  But here, the CLRA notice letter was only served on Nissan after it left
     the state due to the plaintiffs' error, so the claim was only properly alleged against Nissan at that
27   point.  In any event, the plaintiffs do not assert this as a basis for proper venue.

28   [9] For clarity, I do not determine that sales by a used-car seller could *never* be actionable under a
     restitution theory against the manufacturer.  The plaintiffs have simply not advanced one that
     succeeds.

United States District Court
Northern District of California

Section II.A–B.  To be sure, consumer protection and merchantability statutes are not the same.  But, here, the reason the vehicles were allegedly not fit for ordinary purpose is essentially the same as the alleged defect for consumer protection purposes.

### F.  Restitution/Unjust Enrichment

As discussed above, Nissan argued that the CLRA and UCL claims could not be actionable under an unjust enrichment or restitution theory when it comes to used vehicles bought from other entities.  *See supra* Section III.D.ii.  Nissan argues here that *any* restitution or unjust enrichment theory cannot be actionable.  Some of its reasons are just rehashes of substantive arguments already addressed, like not having evidence of a defect, *see* SJ Mot. 24, which I reject to that extent.

As explained, though, I agree with Nissan that the plaintiffs have advanced no actionable restitution or unjust enrichment theory for the purchase of used cars from entities other than Nissan.  *See supra* Section III.D.ii.  When a consumer purchased a used vehicle, there is no evidence that *Nissan* received a benefit from that transaction; while Nissan received money from the *initial* sale, the consumer who later bought the used cars is not the person would not have paid that money.  It is unclear if Nissan intended its restitution argument to sweep broader than this.  *See* SJ Mot. 24 (making a one-sentence argument about repairs).  If the argument *was* intended to be broader or different than this, it is insufficiently developed to grant summary judgment on.  Summary judgment is granted to this limited extent.

### G.  Adequate Remedy at Law

Nissan's motion and supplemental brief argue that the plaintiffs have an adequate remedy at law, so they cannot receive any equitable remedies (such as equitable restitution).  SJ Mot. 25; Nissan Supp. 9–10.  This issue will not be addressed now.  The full extent of the plaintiffs' remedies at law will be clear at the end of the trial, not before.  At that point, we will take up what equitable remedies, if any, are warranted.  I recognize that some courts have dismissed equitable claims at earlier junctions in the case, but that risks depriving the plaintiffs of remedies to which they may be entitled.

United States District Court
Northern District of California

**H.  Conclusion**

Nissan's motion for summary judgment is GRANTED IN PART to the extent the plaintiffs' claims seek restitution or unjust enrichment for the purchase of used cars from entities other than Nissan.  It is otherwise DENIED.

**IV.    MOTION FOR CLASS CERTIFICATION**

The plaintiffs move to certify several Rule 23(b)(3) damages classes of consumers who purchased class vehicles—one class for vehicles purchased in each of California, Colorado Florida, Illinois, and New York.  *See* Motion for Class Certification ("Cert. Mot.") [Dkt. No. 134-4].  In the alternative, they move to certify Rule 23(c)(4) issues classes under for those matters that I determine are not appropriate for class treatment.[10]

**A.  Rule 23(a)**

First, I examine the Rule 23(a) requirements.  Nissan does not dispute numerosity or commonality, but it argues that the named plaintiffs are not typical or adequate.  *See* Opposition to the Cert. Mot. ("Cert. Oppo.") [Dkt. No. 146-18] 31–34.

**i.    Numerosity**

FRCP 23(a) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. (a)(1).  "[C]ourts canvassing the precedent have concluded that the numerosity requirement is usually satisfied where the class comprises 40 or more members, and generally not satisfied when the class comprises 21 or fewer members." *Twegbe v. Pharmaca Integrative Pharmacy, Inc.*, No. CV 12-5080 CRB, 2013 WL 3802807, at *2 (N.D. Cal. July 17, 2013).

This requirement is satisfied.  The plaintiffs have introduced evidence that there are more than 300,000 class vehicles that were leased or sold in the relevant states just until the model year 2020, let alone those since then.  *See* Cert. Mot. 10 (collecting citations).  Nissan does not dispute this.

---

[10] In their supplemental reply, the plaintiffs argued for the first time that a 12(b)(2) injunctive relief class should be certified.  *See* Dkt. No. 227 at 8.  They never sought certification of an injunctive-relief class in their motion or even mentioned it in their briefing, which were focused entirely on damages classes.  They have forfeited the opportunity to do so.

United States District Court
Northern District of California

### ii.   Commonality

FRCP 23(a) requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. (a)(2).  Satisfying the commonality test "only requires a single significant question of law or fact."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012).

There are common questions of law and fact.  They include the factual issues of the nature of the alleged defect (which the plaintiffs assert is common to all class vehicles), Nissan's knowledge (or lack thereof) about the alleged defect, whether a reasonable consumer would find the omission of the defect material, whether the vehicles violated the implied warranty of merchantability, and the extent to which Nissan's nondisclosure constituted concealment.  Nissan does not dispute that this requirement is satisfied.

### iii.   Typicality

Rule 23 also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class" and "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(3)–(4).  The "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

The plaintiffs here are typical of the class within the meaning of Rule 23.  Each made a purchase of their car in the state whose class they are representing.  There were no disclosures to any of them of the alleged defect.  Each of them purchased the vehicle, therefore, at the price they would pay without knowledge of the defect.  And, as noted, the consumer protection statutes use an objective reasonable person standard and the warranty statutes use an objective fitness standard.

Nissan says that the plaintiffs are not typical of the class because they face "unique defenses."  *Hanon*, 976 F.2d at 508.  Nissan's first proffered unique defense is on causation: it contends that it has introduced evidence that "most" of the named plaintiffs' PSRs broke due to "external impacts."  Cert. Oppo. 32.  This does not render the named plaintiffs atypical.  Their theory is that the PSRs were *designed* such that they may not necessarily hold up under normal driving conditions.  The harm under the consumer protection statutes is the *nondisclosure* of that

30

1    issue.  The harm under the merchantability statutes is that they were not fit for ordinary use at sale.

2    So Nissan's ground for atypicality is doubly irrelevant: first, it fits fine with the plaintiffs' theory

3    if external impacts cause that shattering, what matters is the design; second, the shattering is not

4    the harm for which the plaintiffs seek recompense, it is the nondisclosure or lack of fitness for

5    ordinary use.

6        Nissan next argues that the New York named plaintiff (Seenarain) was not in privity with

7    Nissan because he purchased his car from a dealership and that, under New York law, privity is

8    required for an implied warranty claim.  Cert. Oppo. 32.  The plaintiffs do not dispute that, as a

9    general matter, privity is required under New York law and a purchase from a dealership does not

10   render a plaintiff in privity with Nissan; I accordingly assume without deciding that both are true.

11   Instead, the plaintiffs' point to a "thing of danger" exception to the privity requirement that some

12   federal district courts have read into New York law for products that create safety hazards.  *See*

13   *Hubbard v. Gen. Motors Corp.*, No. 95 CIV. 4362, 1996 WL 274018, at *5 (S.D.N.Y. May 22,

14   1996); *see also Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 540 (D. Md. 2011); *Wade v. Tiffin*

15   *Motorhomes, Inc.*, 686 F.Supp.2d 174, 190–91 (S.D.N.Y.2009).  At least one federal district court

16   has explicitly rejected the existence of this exception.  *See Dixon v. Ford Motor Co.*, No. 14-CV-

17   6135 JMA ARL, 2015 WL 6437612, at *4 (E.D.N.Y. Sept. 30, 2015).

18       Neither party has pointed to, and I have not found, any decisions from the New York state

19   courts that would help resolve this split.  I agree with the weight of the federal authority that New

20   York law does absolve parties of the privity requirement when the alleged violation of the implied

21   warranty constitutes a safety hazard.  That finding, as courts taking this view have explained,

22   better aligns with broader legal principles and helps effectuate the goals of the statutes.  It flowed

23   from a decision of New York's high court carving out a safety exception to the privity requirement

24   for products-liability suits.  *Goldberg v. Kollsman Instrument Corp.*, 12 N.Y.2d 432 (1963).  As

25   other courts have explained, the rationale for doing so applies equally well to consumer

26   protection's privity requirement.  *See, e.g.*, *Doll*, 814 F. Supp. 2d at 540.

27       Nissan contends that several named plaintiffs (Seenarain and Spry) engaged in spoliation

28   by, respectively, selling their vehicle and "agreeing to have [the vehicle] totaled" after an accident

after litigation had begun. Cert. Oppo. 32–33. On these facts, I do not believe there was spoliation, so this does not render these plaintiffs atypical. Spoliation occurs when evidence is destroyed and there is a party at fault, there is prejudice to the opposing party, and there is a lesser sanction available than a finding of spoliation. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.,* 888 F. Supp. 2d 976, 992 (N.D. Cal. 2012) (Koh, J.). But here, both of these named plaintiffs had the shattering occur followed by Nissan dealerships *repairing* their PSRs; accordingly, even if they had kept their vehicles it would not have assisted Nissan because the shattered PSRs were no longer in them to inspect.

Nissan's motion also raised issues about the California plaintiffs' (Johnson and Loury) entitlement to bring a CLRA claim. Cert. Oppo. 33. The filing of an amended complaint and the motions that followed it have resolved those issues.

Nissan asserts that the plaintiffs cannot be typical for purposes of restitution if they bought a car used from an entity other than Nissan because they cannot show that the money went to Nissan. Cert. Oppo. 33–34. I have, however, granted Nissan summary judgment on any claims predicated on this theory, so the issue of certification for it is moot. *See supra* Section III.F.

Nissan also contends that the Florida named plaintiff (Sullivan) is not typical because Florida consumer protection law requires a "manifestation" of a defect and Sullivan's PSR did not shatter. Cert. Oppo. 34–35. Nissan's argument, however, rests on one decision of one division of the Florida Court of Appeal, *Kia Motors America Corp. v. Butler*, 985 So. 2d 1133 (Fla. Dist. Ct. App. 2008). Courts after *Butler* have disagreed with it. *See, e.g.*, *Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2018 WL 2325426, at *19 (N.D. Cal. May 8, 2018); *In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *25 (S.D.N.Y. July 15, 2016). There is no manifestation requirement in the plain text of the statute, the state court added it largely out of a general policy concern. As far as I am aware, no other state court has adopted it and similar state consumer protection laws do not impose it. I agree with the post-*Butler* courts that have not found a manifestation requirement in Florida law.

### iv.  Adequacy

As noted, Rule 23(a) requires that "the representative parties will fairly and adequately

United States District Court
Northern District of California

protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  That determination has two parts: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019) (internal quotation marks and citation omitted).

The plaintiffs are adequate representatives.  As noted above, they are typical of the class and I perceive no conflicts of interest.  They have now prosecuted the action for five years, including sitting for depositions.

Nissan's only counterargument is that the plaintiffs are inadequate representatives because they have engaged in claim-splitting.  Cert. Oppo. 34.  According to Nissan, the plaintiffs "have carefully trimmed their claims to exclude any potential complicating facts . . . that might predominate over common facts" and that "[c]ourts disapprove" of this practice.  *Id.*  Nissan misunderstands the doctrine and the basis of courts' concern.  In the class-action context, there is always a worry that the named plaintiffs will place their own interests above the class's interests.  One manifestation of this self-interested behavior is "claim-splitting," where named plaintiffs forgo some claims for relief that would be good for the class to focus on the ones best for their *individual* interests while attempting to bind the whole class to the outcome of the action.  *See, e.g.*, *In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 531–32 (N.D. Cal. 2010) (Illston, J.).  But here, that is not even what Nissan *argues* has occurred; Nissan just contends that the plaintiffs have pursued claims and issues that have the best chance of getting certified while leaving behind potential claims and issues that would not.  So long as the named plaintiffs' interest in doing so is aligned with the class's interest, that does not render them inadequate representatives.

## B.  Rule 23(b)(3)

Because Rule 23(a) is satisfied, I turn to whether certification is appropriate under Rule 23(b)(3).  A Federal Rule of Civil Procedure 23(b)(3) class can be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly

United States District Court
Northern District of California

1    and efficiently adjudicating the controversy."

2        The Rule provides that the following factors are "pertinent" to the predominance and

3    superiority inquiry: "(A) the class members' interests in individually controlling the prosecution or

4    defense of separate actions; (B) the extent and nature of any litigation concerning the controversy

5    already begun by or against class members; (C) the desirability or undesirability of concentrating

6    the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a

7    class action."  Fed. R. Civ. P. 23(b)(3).  "The Rule 23(b)(3) predominance inquiry tests whether

8    proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*

9    *Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

                        **i.   Generally, Common Issues Predominate**

11       Here, common issues predominate over individualized ones (except as stated below).

12       Start with the consumer protection claims.  The core question under each state's law there

13   will be whether Nissan had a duty to disclose the existence of the alleged defect.  *See Gerber*, 552

14   F.3d at 938 (California); *Oswego*, 85 N.Y.2d at 26 (New York); *Mazella*, 548 F. Supp. 3d at 356

15   (same); *Carriuolo*, 823 F.3d at 983 (Florida); *Connick*, 174 Ill. 2d at 505 (Illinois); *Rhino Linings*,

16   62 P.3d at 148 (Colorado).  That, in turn, will be determined using the objective reasonable

17   consumer test—an analysis that is particularly well-suited to class treatment.  *See supra* Section

18   III.B.  The jury will be asked whether a reasonable consumer would find the nondisclosure

19   material.  The jury will also be asked whether Nissan knew of the alleged defect, which also turns

20   on common proof, rather than anything individualized.  This is all reinforced by the nature of the

21   alleged problem with the PSRs here: that something in their *design* renders them unsuitable for

22   normal driving conditions.  If there are individual issues to be resolved, they have to do essentially

23   with the precise amount of damages consumers will get based on the particular model of car they

24   purchased at a particular price.  In this circuit, that sort of individualized damages calculation does

25   not defeat certification.  *See Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th

26   Cir. 2010).

27       A similar story plays out when it comes to the implied warranty of merchantability claims.

28   The question under each state's law for those claims will be whether the vehicles were fit for

ordinary purpose.  *See, e.g.*, *Minkler v. Apple, Inc.*, 65 F. Supp. 3d 810, 819 (N.D. Cal. 2014) (Davila, J.) (discussing the requirements of the implied warranty).  That question bears a strong resemblance to the inquiry the jury will be conducting under the consumer protection statutes in that it will require an assessment of (1) what constitutes an ordinary purpose and (2) whether the design of the PSRs lived up to it.  Those questions will, just as above, be subject to common proof. And because the warranties are implied by law, there is no issue of individualized warranties given.

### ii.  A Class Action is Superior

As Nissan does not dispute (except to the extent its other arguments might bear on the issue), a class action is a superior vehicle for litigating these claims.  There are potentially hundreds of thousands of class members across several states; it would be a waste of their time and resources, Nissan's time and resources, and the judiciary's time and resources to litigate their cases individually.  This case, moreover, has required significant expert evidence; it would not be feasible for each individual consumer to replicate that in each case.

### iii.  The Illinois Class Will Not Be Certified

On the Illinois claims, Nissan points out, Cert. Oppo. 23, that I have previously held that the Illinois consumer protection statute does not support a pure omission theory but instead requires an incomplete communication.  *See* Dkt. No. 91 at 3; *see also De Bouse v. Bayer*, 922 N.E. 2d 309, 316 (Ill. 2009) ("[W]e have repeatedly emphasized that in a consumer fraud action, the plaintiff must actually be deceived by a statement or omission. If there has been no communication with the plaintiff, there have been no statements and no omissions.").  And because of this, it argues, common issues will predominate about the methods of dissemination of information. Cert. Oppo. 23.  Nissan has raised a substantial concern, and courts have often denied certification based on similar problems.  *See, e.g.*, *Reitman v. Champion Petfoods USA, Inc.*, No. CV181736DOCJPRX, 2019 WL 7169792, at *8 (C.D. Cal. Oct. 30, 2019), aff'd, 830 F. App'x 880 (9th Cir. 2020) (denying certification on predominance grounds when there would be wide variance in the misleading communications plaintiffs would have been exposed to).  The plaintiffs' briefing simply does not respond to illustrate how common issues would predominate

United States District Court
Northern District of California

1    on these facts.  Accordingly, they have not carried their burden to show that certification of the

2    Illinois class is appropriate.  To that extent, the motion to certify is denied.

3                        **iv.  California and New York Class Definitions**

4            Nissan challenges the predominance of common issues when it comes to the California and

5    New York classes because both state statutes require that the product be for *personal* use.  Cert.

6    Oppo. 24–25.  And, says Nissan, some class members may have bought theirs for business use.

7    *Id.*  Maybe this would be a predominance problem; I do not determine one way or the other.

8    Instead, I take the plaintiffs' invitation, Cert. Reply 11, to simply tweak the proposed definitions

9    for the California and New York classes to extend only to those who purchased the vehicles for

10   personal use.  *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (holding that courts

11   may modify class definitions).  Not only would it be silly to toss out the entire classes for

12   something like this, but even setting aside certifiability issues, the California and New York laws

13   do not substantively allow recovery in other circumstances anyway.[11]

14                **v.  New York and Colorado Statutes of Limitations on Warranty Claims**

15           Nissan argues that, when it comes to the warranty claims under Colorado and New York

16   law, the statute of limitations runs from delivery, so the jury will have to determine whether each

17   class member's claims are untimely.  Cert. Oppo. 26–27.  The plaintiffs do not offer any defense

18   on this issue, other than to say that the class can be shortened to accommodate it.  Cert. Reply 14.

19   Accordingly, the class definition will be changed to include a class period within the statute of

20   limitations.  *See Gen. Tel.*, 457 U.S. at 160.

21                        **vi.  Nissan's Remaining Counterarguments**

22           Nissan offers several other rebuttals, but none are persuasive.[12]

23

24   _____

25   [11] Nissan argues that Seenarain (the New York named plaintiff) bought her vehicle for business
     use, Cert. Oppo. 24–25, but the evidence contradicts that claim.  Seenarain bought a used vehicle
26   that was *previously* part of a business fleet, but *she* purchased it for personal use.  *See* Cert. Reply,
     Ex. II at 58:22–39:11 (deposition testimony).

27   [12] Nissan repeats its argument that Florida law requires a manifestation of the defect.  Cert. Oppo.
     25–26.  And it repeats its argument about privity under New York law.  *Id.* 27.  As explained in
28   preceding sections in-text, I reject those readings of both states' laws.

United States District Court
Northern District of California

### 1.  Lack of Common Defect

Nissan first argues that there is no evidence of a "defect" for essentially the same reasons it gave at summary judgment and because I should exclude the plaintiffs' experts.  I denied its *Daubert* motions.  Even if I had not, there is still evidence of a defect that can go to the jury—as discussed above when it came to summary judgment, the evidence of consumer complaints and reports of shattering is good enough.

### 2.  Individual Causes of Shattering

Nissan contends that there will be a need to examine why *each* PSR actually shattering, requiring individualized examination.  Cert. Oppo. 19–21.  I disagree.  As I have explained several times, the plaintiffs' theory does not depend on the precise reason their individual PSRs actually broke, it depends on whether the PSRs as a group were *designed* such that they were not fit for normal driving conditions or fit for ordinary purpose.  And Nissan counters that its own evidence shows that most PSRs break from external impacts.  But that is a merits question: whether the PSRs were designed as the plaintiffs contend.  If Nissan is right and the plaintiffs cannot show that defect exists, it means the plaintiffs lose on the merits, not that common issues do not predominate—indeed, that their claims could fall in one fell swoop by failure to demonstrate a defect shows that they *are* amenable to class treatment, rather than the reverse.

### 3.  Variance in Consumer Protection Statutes

Nissan next contends that the consumer protection inquiries in all five states require so much individualized analysis that it defeats certification.  Cert. Oppo. 22–26.

Its first reason for thinking so is that its knowledge of PSR claims has changed over time, requiring individualized proof.  *Id.* 22.  But if Nissan's knowledge changed over time, then common proof as to the whole class will show it.  Nissan is a single company; evidence of its knowledge may change over time, but it will be uniform as it relates to the claims at each period in time, and Nissan has pointed to no concrete evidence to the contrary.  And if the plaintiffs cannot show Nissan's knowledge during the class period to the jury's satisfaction, so be it; but it does not mean that any individualized issue predominates.

Nissan also contends that class members will have been exposed to different information at

different times, so there will be individual issues about what they knew, when they knew it, and how they would have had the disclosure revealed to them. Cert. Oppo. 22–23. To the extent the case is about consumer protection law, however, it is based on an omission theory. The plaintiffs need not have viewed any particular misleading advertisement to be misled. Instead, the plaintiffs will just have to introduce (common) evidence that Nissan failed to disclose the information and that the information would have reached consumers had it been disclosed. That is unlike any of the cases Nissan cites that denied certification for reasons like this. To the extent the case is about merchantability, the violation occurs when the item is sold without being fit for its ordinary purpose and without an adequate disclosure or disclaimer.

Nissan next argues that there are too many individual questions about consumers' knowledge, or lack thereof, of the alleged defect. Cert. Oppo. 23–24. As a result, it contends, common questions do not predominate when it comes to reliance (and materiality). *Id.* This misunderstands the inquiry. As explained, the question is whether the omitted information would be material to a *reasonable consumer*—and the presumption of reliance that follows. To the extent Nissan's argument is that there was publicly available information about the alleged defect, that is insufficient to show that individual issues predominate. It is not disputed that *Nissan* did not reveal the defect and, indeed, it still denies that it exists. So the idea that there was public reporting sufficient to convince consumers of it is farfetched. More fundamentally, whether sufficient information about the defect was revealed is, here, a merits question: if enough was revealed, maybe it could defeat the claim that Nissan concealed the information. But it is a question that asks about the reasonable consumer.

When it comes to the Florida class, Nissan argues that Florida law requires a mixed standard for reliance that combines the objective reasonable consumer test with a subjective test that requires examination of a particular consumer's specific context. *See* Cert. Oppo. 25. It makes too much of that doctrine. The only quirk to Florida law is that it applies the objective reasonable consumer test with a slight modification: "the plaintiff must show that "the alleged practice was likely to deceive a consumer *acting reasonably in the same circumstances*." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983–84 (11th Cir. 2016) (internal quotation marks

United States District Court
Northern District of California

and citation omitted) (emphasis added).  But the test is still an objective one.  *Id.* at 984.  Here, I see no reason—and Nissan has pointed to none—in which individuals would be in such distinct circumstances when purchasing these vehicles as to preclude common issues from predominating.  And, indeed, courts have certified classes under Florida consumer protection law in similar circumstances.

### 4.  Unjust Enrichment

Nissan argues that, to the extent the claims seek to recover for unjust enrichment, they will require individualized inquiries because, as both parties agree, unjust enrichment under each state's law requires an express contract.  *See* Cert. Oppo. 26 (collecting citations); *see also* Cert. Reply 13 (agreeing that express contracts are required).  But the plaintiffs have submitted evidence that each vehicle was sold with an express warranty.  *See* Cert. Reply 13 (collecting citations).  If so, no individualized inquiries appear to be required.  If the evidence ultimately shows otherwise, I may decertify the classes when it comes solely to these claims.

### 5.  Uninjured Class Members

Nissan makes two related arguments.  It argues that some class members will have sold or traded their vehicles without the windshields shattering and, as a result, there will be more than a *de minimis* number of uninjured class members.  Cert. Oppo. 27–28.  As an initial matter, Nissan's *de minimis* argument depends on *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774 (9th Cir. 2021).  But, since Nissan filed its brief, the Ninth Circuit has overturned that portion of *Olean* in an en banc decision and made clear that the question remains whether common issues predominate.  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022).

More importantly, Nissan misunderstands the injury at the heart of this suit.  The *injury* for purposes of the consumer protection statutes occurred when class members paid more than they would had the information been disclosed.  *See Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 822 (9th Cir. 2019).  The *injury* for purposes of the implied warranty claims occurred when class members were sold a vehicle not fit for ordinary purposes.  *Cf. id.*  As I have previously explained in rejecting a similar argument, Ninth Circuit precedent is clear that damages are calculated at *that*

time. *Maldonado*, 2021 WL 1947512, at *24.

### 6. Infiniti

In its supplemental brief, Nissan argues that the Infiniti models should no longer be Class Vehicles because there are no named plaintiffs who purchased one.[13]  Nissan Supp. 8–9.  I disagree.  The plaintiffs have shown that the PSRs in the Infiniti models are "substantially similar" to the PSRs in the named plaintiffs' vehicles, so can remain part of the suit.  *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir. 1991).  In particular, the plaintiffs' experts analyze the Infiniti PSRs along with the others, in one analysis, demonstrating their substantial similarity.  *See id.*

### C. Damages

Nissan attacks the damages model for failing to satisfy Comcast *Corp. v. Behrend*, 569 U.S. 27 (2013), which requires that damages be tied to the theory of class-wide harm.[14]  The details of that model are explained above in the section addressing the *Daubert* motion on Gaskin and Weir.  *See supra* Section I.A.

Nissan's main argument is that Gaskin and Weir calculate damages at point of first sale, which does not "fit" those class members who bought used vehicles.  Cert. Oppo. 28–31.  At the hearing, I asked the parties to zero in on this issue.  Based on their arguments, and for the reasons that follow, I am satisfied that the plaintiffs' damages model satisfied Rule 23 and *Comcast*.

As explained above, Gaskin and Weir's damages model is supposed to determine the price premium for a non-defective vehicle over a defective one to a consumer.  *See supra* Section II.A. Then, they multiply that premium by the total number of new vehicles purchases.  *See id.*  That number will be the total pool of damages in the case.  The *amount* of damages that each class member is entitled to can then be parceled up among the class members according to their injury. That makes sense because "the amount of damages is invariably an individual question and does not defeat class action treatment."  *Yokoyama*, 594 F.3d at 1094 (internal quotation marks and

---

[13] There used to be, but that named plaintiff's claims were voluntarily dismissed.  Dkt. No. 132.

[14] Nissan also echoes much of its *Daubert* argument about Gaskin and Weir's damages model, which I address above.

40

United States District Court
Northern District of California

1   alteration omitted).  But that total pool of damages is sufficiently fitted to the harm to satisfy

2   *Comcast*: it measures the harm associated with overpaying for a vehicle when it was purchased

3   from Nissan.  To Nissan's point about used vehicles, if a class member has purchased a used

4   vehicle from someone else, she will likely be entitled to a lesser amount of damages than someone

5   who purchased a new vehicle (as the plaintiffs' counsel conceded at the hearing).  But that too is

6   an issue of allocation of damages.  The parties or court can settle on an appropriate methodology

7   for adjusting the *amount* of *individual* damages to take due account of the depreciation in value

8   and the lower price paid.  This is not a problem from the perspective of *Comcast* because it *does*

9   measure classwide damages.  Nor does it require Nissan to pay for damages divorced from sales it

10  made: the number is tied entirely to new sales that Nissan itself made without penalizing it for any

11  used sale.

12          **D.  Conclusion**

13          The motion to certify the California, Colorado, New York, and Florida classes is

14  GRANTED with the definitions as discussed above.  The motion to certify the Illinois class is

15  DENIED.  Of course, the case can only proceed on claims that remain.  I leave it to the parties to

16  work out in the first instance what the contours of the case are in light of all findings in this Order.

17                                          **CONCLUSION**

18          The *Daubert* motions are DENIED.  Nissan's motion for summary judgment is

19  GRANTED IN PART and DENIED IN PART as stated above.  The plaintiffs' motion for class

20  certification is GRANTED IN PART and DENIED IN PART as stated above.  The related

21  motions to seal will be ruled on in a forthcoming order.

22          A Case Management Conference is set for September 20, 2022, at 2 p.m.  The Joint

23  Statement, to be filed by September 13, 2022, shall include a proposed schedule for trial and the

24  remainder of the case.

25          **IT IS SO ORDERED.**

26  Dated: July 21, 2022

27  _____

28  William H. Orrick
    United States District Judge

41